**Laura Anne LARRABEE, a Minor, by Karen V. Larrabee Her Guardian Ad Litem, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 64-1665.**

United States District Court
S. D. California,
Central Division.

May 18, 1966.

James G. Butler, Los Angeles, Cal., for plaintiff.

Manuel L. Real, U. S. Atty. for Southern Dist. of California, by Frederick M. Brosio, Jr., Asst. U. S. Atty., Chief, Civ. Div., and Dzintra I. Janavs, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

THURMOND CLARKE, District Judge.

By this action, a minor child seeks to recover damages for blindness of one eye, alleged to have been caused by injuries negligently inflicted at birth. The action arises under the Federal Tort Claims Act (28 U.S.C. §§ 1346, 2671–2680).

The child, Laura Anne Larrabee, was born July 23, 1963, in a base hospital at March Air Force Base, California, where her father, James Larrabee, was stationed.

The mother, Karen V. Larrabee, testified she received prenatal care at the base hospital. The child was her first. Labor began early the morning of July 23; her husband took her to the hospital at 8 a. m. The child was delivered by use of forceps at 4:15 p. m.

Mrs. Larrabee testified that after she had been returned from the delivery room, one of the doctors told her there had been an accident, that the forceps had slipped on the child's eye.

When the mother saw the baby the next morning, the right eye was swollen shut and appeared to be protruding; there were abrasions on the temple and the cheek bone, and across the eyelid.

The following day (July 25) the right eye was slightly open. It appeared bloodshot; the iris was dark brown; the pupil was dilated; the eyeball still protruded. Thereafter Mrs. Larrabee saw the baby about every four hours. Each time the eye had opened slightly wider. The dilation continued. The other eye was a deep blue, and showed no marks.

Mrs. Larrabee testified the right eye continued to protrude for about two weeks. The pupil remained dilated, but the bloodshot condition disappeared. When the child was between four months and six months old, the right eye had become more blue than brown.

Subsequent medical examination disclosed the right eye was completely blind. The condition was diagnosed as either a tumor or detachment of the retina.

The child's mother testified that at present the right eye turns in; it is a darker blue than the left, and appears to be smaller than the left eye. Mrs. Larrabee said the baby did not learn to walk until she was 15 months old, but other-

wise her activities have been no different from those of other children her age.

The child's father and her paternal grandmother gave testimony similar to the mother's about the appearance of the child. The child was presented before the court for observation.

Dr. John H. Jennings, an Air Force physician attending at the birth, testified that in the course of delivery the child's head became arrested in a transverse (i. e., sideways) position. The baby could not be delivered until forceps were used to raise and turn the head. After delivery, the doctor saw pressure marks where the forceps had been applied. There was some swelling around the right eyelid and the cheek. Dr. Jennings testified pressure marks are not uncommon after forceps deliveries.

Dr. Jennings testified actual delivery was by Dr. Harold Morgan. The witness said Dr. Morgan made "a good application" of the forceps, and the head moved relatively easily once it had been raised. He testified the instrument did not slip.

Dr. Philip Shanedling, an ophthalmologist, examined the child's eye in July, 1964. He found

"* * * the cornea * * * and the anterior chamber, appeared to be grossly normal. The iris was somewhat darker in color than the other; the pupil was dilated by medication, but was not round and regular, it was derounded as though by adhesions. Examination of the anterior of the eye with the ophthalmoscope revealed the presence of a massive non-vascularized yellowish intra-ocular structure, which was certainly not a normal structure, which occupied most of the posterior portion of the eye. * * * There was no evidence of current ocular inflammation or irritation. * * *."

In response to a hypothetical question setting out the evidence, coupled with results of his own examination and a medical history, Dr. Shanedling testified in his opinion the condition of the eye was "of post-traumatic, post-inflammatory origin." Asked whether the forceps would have been a competent producing cause, the ophthalmologist testified this was "very likely."

The witness further said the fact only one eye was affected indicates blindness was not caused by intra-uterine infection nor by a developmental defect.

Dr. Shanedling testified if the eye should later show signs of inflammation it would have to be removed to prevent sympathetic ophthalmia, a transference of the inflammation to the good eye. He said if there is no inflammation, the right eye should be left in place until the child's face has fully developed; earlier removal would tend to distort the features.

Dr. Emile Ravdin, an ophthalmologist, testified an examination when the child was ten and one-half months old showed the right eye was blind. On the basis of his examination, a medical history, and the same hypothetical question asked the preceding witness, Dr. Ravdin said in his opinion the application of forceps was the traumatic initiating factor. The specialist testified if the condition had resulted from a tumor rather than a traumatic inflammatory condition, the child "would have lost the eye or would not be living today."

Dr. Chester Bonoff, specialist in diagnostic radiology, testified X-rays and measurements showed the mother's pelvis is small and there is an accentuated narrowing in mid-pelvis.

Dr. William Benbow Thompson, associate professor of gynecology and obstetrics at California College of Medicine and head physician in gynecology and obstetrics at Los Angeles County General Hospital Unit Two, testified that considering the size and shape of the pelvis, the size and position of the baby, and the forces of labor, the child should have been delivered by Caesarian section. He further testified conduct of the attending physicians in failing to have X-rays taken and failing to perform a Caesar-

616

ian section fell below the standard of care and medical skill in the community.

Dr. Thompson testified the presence of forceps marks over the bony surfaces around the eye "indicates a poor application of the obstetrician's forceps."

Physicians called by the Government advanced the theory blindness was caused by an intra-uterine infection.

Dr. Gustav E. Ledfors, obstetrician and gynecologist, testified in his opinion the standard of care in the community would not have required taking of X-rays of the mother's pelvis nor a Caesarian operation. He said in his opinion blindness may have been caused by infection during the last three months of pregnancy. He further testified if forceps had caused retinal detachment there would have been evidence of injury to the child's central nervous system.

Dr. Leonard Apt, a pediatric ophthalmologist, examined the child in May and July of 1964. He testified in his opinion the injury probably was not caused by forceps trauma, but that the symptoms were consistent with existence of congenital or intra-uterine inflammation.

Dr. Keith Russell, obstetrician and gynecologist, testified the delivery procedure was well within the standard of care in the community. He testified retinal detachment from forceps trauma "wouldn't occur under these circumstances," but he conceded improper use of forceps can cause extensive injury.

The court thus is faced with two diametrically opposed lines of testimony.

The observations of lay witnesses and testimony of plaintiff's medical witnesses indicate a connection between the forceps delivery and the subsequent blindness. There is evidence the care given by attending physicians fell below the requisite standard. Yet there is no such positive nexus that one may rule out any other cause of blindness.

Plaintiff seeks to establish liability by invoking the doctrine of res ipsa loquitur.

Negligence on the part of a physician is never presumed. It must either be proved by expert testimony which shows the standard of medical practice in the community was not followed, or be inferred from proved facts and inferences which, by common knowledge, may be drawn from them. The physician is not required to guarantee results. Under certain circumstances, the doctrine of res ipsa loquitur is applied. Thereby negligence may be inferred from the unusual character of the injuries suffered when these have occurred while the patient and his actions were under a doctor's or a hospital's care and exclusive control. Bruce v. United States, 167 F.Supp. 579 (S.D.Calif. 1958).

The doctrine may be invoked when there is no definite proof of causation. The Supreme Court of California, in the case of Quintal v. Laurel Grove Hospital, 62 Cal.2d 154, 41 Cal.Rptr. 577, 397 P.2d 171 (1964) stated:

"'* * * There is no absolute requirement that the plaintiff explain how the accident happened. Res ipsa may apply where the cause of the injury is a mystery, if there is a reasonable and logical inference that defendant was negligent, and that such negligence caused the injury. * *.'"

In the case of Inouye v. Black, 47 Cal. Rptr. 313 (3rd Dist.Ct.App. 1965), the court stated at p. 315:

"* * * the res ipsa loquitur doctrine creates an inference of negligence where, in the light of past experience, (a) the accident was probably the result of someone's negligence and (b) the defendant is probably the responsible person. * * * The plaintiff need not produce evidence excluding all possible causes other than the defendant's negligence. * * *"

The court finds plaintiff has thus sustained the burden of proof.

The question of fixing damages for loss of use of an eye was before this court in the case of Owen v. United States, D.C., 251 F.Supp. 38 (1966), wherein the court awarded $60,000.00 general damages to a 42-year-old man

industrially blinded in one eye by negligence of a Navy physician. The authorities cited therein on the question of amount of damages are applicable to the present case.

In this instance, damage is greater in that the plaintiff is an infant who, insofar as the evidence shows, will be handicapped throughout her school years and the remainder of her life. There is no evidence of prospective rehabilitation. There is a possibility of facial disfigurement and even, in the event of inflammation, a danger of blindness in the other eye.

■ In view of these factors, the court therefore finds plaintiff is entitled to damages in the amount of $100,000.00.

Counsel for plaintiff is directed to prepare findings of fact, conclusions of law, and judgment in accordance herewith.