James R. REILLY, a Minor, by James P. Reilly, his father and next friend, and James P. Reilly, Individually, Appellees,

v.

J. J. STRAUB, M.D., Appellant.

No. 62208.

Supreme Court of Iowa.

Aug. 29, 1979.

Rehearing Denied Oct. 11, 1979.

William C. Fuerste of Fuerste, Carew, Coyle, Juergens & Sudmeier, Dubuque, for appellant.

Edward J. Gallagher, Jr. of Gallagher, Martin, Keith & Langlas, Waterloo, for appellees.

Considered by REYNOLDSON, C. J., and LeGRAND, HARRIS, ALLBEE and LARSON, JJ.

REYNOLDSON, Chief Justice.

The infant plaintiff James R. Reilly brought this malpractice action for damages arising out of a birth injury to his right arm against the defendant obstetrician J. J. Straub. The jury returned a $125,000 plaintiff's verdict and from judgment thereon defendant appeals. We affirm on condition.

June 11, 1972, defendant served as obstetrician at plaintiff's birth. Plaintiff weighed ten pounds fourteen ounces. During delivery defendant encountered shoulder dystocia, a complication in which the child's shoulders are so wide they have difficulty in passing naturally through the mother's pelvic opening.

Plaintiff's petition was filed by his father as next friend. In the first amended count, plaintiff alleged defendant was negligent in, among other things (1) pulling on plaintiff's right arm to remedy the shoulder dystocia, (2) using undue force to accomplish delivery, and (3) failing to perform a cesarean section when he knew or should have known plaintiff "was an excessive sized infant." In another count plaintiff relied on the res ipsa loquitur doctrine: that defendant did not exercise due care before and during plaintiff's delivery, that plaintiff was at all material times under the exclusive control of defendant, and that plaintiff's injuries in the ordinary course of events would not have occurred without negligence on defendant's part.

Plaintiff's mother was twenty-nine years old and weighed over two hundred pounds when he was born. She had previously given uneventful birth to an eight-pound six-ounce girl on July 6, 1968, and an eight-pound twelve-ounce boy on September 24, 1969. Urine tests for diabetes had always been negative. Although he knew of diabetes in Mrs. Reilly's family and knew a diabetic mother was apt to produce an excessive-sized infant, defendant did not run a time-consuming and expensive, but more

conclusive, glucose tolerance test or blood sugar test on Mrs. Reilly. Several months later a test established diabetes. On deposition defendant opined Mrs. Reilly quite possibly was diabetic during plaintiff's last trimester.

Labor before plaintiff's birth was neither extended nor eventful. The birth progressed normally and the head was delivered. But because of plaintiff's size his anterior, right shoulder became lodged behind the pubic symphysis—the arching bone structure tying the pelvic structure together in front. Normal delivery ceased.

Defendant testified he then performed the "Praug" maneuver, applying downward pressure on plaintiff's head in an effort to glide the shoulder beneath the symphysis. He then unsuccessfully rotated the shoulders, attempting to find a more helpful diagonal diameter. During at least part of this time, two attending nurses applied fundal pressure by pushing on Mrs. Reilly's abdomen. Defendant then reached into the birth canal and extracted the left arm and shoulder. This delivery of the left shoulder caused the right shoulder to drop from behind the symphysis and delivery was completed.

Defendant clamped and severed the umbilical cord and circumcised plaintiff. He immediately noticed the right arm was flaccid. Another doctor later arranged for plaintiff to be examined at the Mayo Clinic, Rochester, Minnesota. Doctors there diagnosed plaintiff's condition as severe injury to the brachial plexus of the right arm, or Erb-Duchenne or Klumpke's palsy, constituting traumatic nerve damage to the cervical area of the spinal column where nerves from the head and arm enter the spinal cord. Despite various surgical repairs and splints at Mayo's, defendant does not seriously dispute that plaintiff's arm is deformed, unattractive, and eighty-five percent permanently disabled.

Plaintiff's mother testified she sensed an interruption in the natural delivery process, but was aware of no tension, excitement or flurry in the delivery room. When she asked defendant later in the day about plaintiff's limp arm, bruised face and reddened eyes, he told her plaintiff would be okay in three or four months. Plaintiff's father testified defendant told him he had pulled on the flaccid arm during delivery, but that it would recover in several months.

The orthopedic surgeon who treated plaintiff at Mayo's was of the opinion the brachial plexus injury was birth related. He also testified neither the incident of brachial plexus injury to plaintiff nor the subsequent diagnosis of Mrs. Reilly as diabetic indicated defendant did anything wrong.

Plaintiff submitted portions of defendant's deposition. The latter attributed plaintiff's facial bruises to manual pressure on the head. He agreed with the brachial plexus diagnosis, attributing the injury to either intrauterine pressure or manual pressure on the head. When describing his efforts to rotate the shoulders he stated he pushed down on plaintiff's head and twisted it with his other hand. He doubted that he told Mr. Reilly he pulled on the right arm.

Dr. Clarence Davis, professor of obstetrics and gynecology on leave of absence from Yale University testified for plaintiff. He described various methods for remedying shoulder dystocia including the three utilized by defendant. He emphasized the universal practice taught and found in all medical literature was to avoid the excessive head traction which causes brachial plexus palsy. He cautioned that fundal pressure, unless accompanied by downward pressure on the symphysis, was counter productive. He estimated a physician has five to seven minutes to remedy shoulder dystocia without danger of incurring injury to the child from lack of oxygen. He had no reason to believe some infants were more subject to brachial plexus injury than others. Responding to a hypothetical question, he was of the opinion the injury would not have occurred but for excessive head traction and in this case could not have been caused by intrauterine pressure. Pulling on the right arm would not be good medical practice "because it would be almost impossible to get to the right arm in this obstetri-

cal situation and pulling on the arm, per se, on either arm is bad practice." A certain amount of head traction is used in most deliveries, but brachial plexus injury is rare, occurring only when "you pull on the head enough to extend the plexus." On cross-examination Dr. Davis stated any brachial plexus injury suffered after a vertex (head first) delivery was negligently caused. He was of the opinion defendant had little difficulty in delivering the left arm and shoulder because there were no lacerations incurred by the mother or plaintiff and the mother lost little blood. He concluded "there was plenty of room." The fact plaintiff was circumcised indicated "the doctor did not believe the baby was in serious shape."

Plaintiff also offered the testimony of Dr. Abraham F. Lash, an Illinois obstetrician and gynecologist, former professor at Northwestern University, current senior consultant at Cook County Hospital, and author of about one hundred published medical articles. He emphasized anticipating shoulder dystocia by noting previous births of large infants, testing for diabetes in an obese mother, and by estimating the child's size. He thought it was likely the mother was diabetic at the time of plaintiff's birth. He opined defendant should have taken x-rays of Mrs. Reilly's abdomen and a blood sugar test for diabetes. He could not conceive that intrauterine pressure caused plaintiff's brachial plexus injury. Responding to a hypothetical question, he opined the injury was caused by defendant's undue pressure on the nerve plexus. He observed that a twist of the infant's head to abstract a baby can dislocate vertebrae as well as injure nerves. He indicated the fundal pressure kept plaintiff from helpful rotation in the birth canal. Severity of the injury to the brachial plexus "depends on how they are using that head; pressing on it or pulling on it or twisting it may be factors which produce this injury." The force can be measured by the result occurring subsequent to it. Dr. Lash observed brachial plexus injuries occur perhaps once in two thousand deliveries and it was unusual to sustain brachial plexus injury with a vertex presentation.

Defendant submitted the testimony of five physicians, four of them from Dubuque. Two of the latter testified a brachial plexus injury does not, per se, imply negligence on the part of the obstetrician. Dr. Schmitz, a Dubuque obstetrician, responded to a hypothetical question which required him to assume the hypothetical obstetrician attempted to secure release of the infant's right shoulder "by *gently* depressing the emerged head downward with his right hand, holding the fetal head from below with his left hand, accompanied by fundal pressure by the nurses." (Emphasis added.) Dr. Schmitz then opined the treatment was proper. On cross-examination he disagreed with but acknowledged authority relating the severity of brachial plexus injury to the amount of traction put on the infant's head, but agreed the injury would occur more often with severe traction on the head. He agreed twisting the infant's head was not good obstetrical practice.

Dr. Bonaldi, another Dubuque obstetrician, testified that the presence of brachial plexus injury in a newborn infant does not, in and of itself, establish the attending obstetrician was negligent. Responding to the same hypothetical question submitted to Dr. Schmitz he agreed with the hypothetical obstetrician's management of the assumed case. On cross-examination he agreed that a severe brachial plexus injury was not likely to be caused by gentle traction on the infant's head.

Dr. Roy Pitkin, professor of obstetrics and gynecology at University Hospitals in Iowa City, made the same response to defendant's hypothetical question. He stated it was impossible to determine fetal size by x-ray. Upon cross-examination he agreed fundal pressure was counter-productive in the case of severe shoulder dystocia. He was unaware of any authority linking severity of brachial plexus injury to the degree of trauma, but said that "intuitively" the two would be related. His method of management in these situations is to first attempt "gentle traction on the head." Dr. Pitkin agreed with literature stating in

these situations there is a great temptation to increase the downward pressure on the infant's head which definitely increases the danger of tearing the nerves of the brachial plexus.

Defendant testified in his own behalf. He described the three maneuvers he employed to remedy the shoulder dystocia, and said that condition in this instance was the worst he ever encountered. He testified plaintiff was in danger of suffocating and he felt fortunate to have delivered him alive and without brain damage. He denied he pulled on the right arm. He agreed with the diagnosis of brachial plexus injury and thought the traction he put on the head contributed to the injury. He nevertheless felt he properly carried out accepted techniques in remedying the dystocia. On cross-examination he characterized the amount of traction he applied to plaintiff's head as "moderate." He agreed the amount of force he used was one of the things that contributed to the injury. He agreed plaintiff had a severe birth injury and that it apparently occurred during the process of delivery. While he thought babies were different in their ability to withstand nerve traction, he knew of no literature which would support this position. He agreed pulling on an arm would be improper procedure. He testified brachial plexus injuries occur more often in breech deliveries but are unusual in a vertex presentation—about one in eight hundred fifty.

Trial court instructed the jury on both counts: specific negligence (the three specifications incorporated in plaintiff's petition, above) and res ipsa loquitur. Defendant unsuccessfully objected to submission of the res ipsa doctrine because "[p]laintiff has proved too much . . . in that he has shown by very specific expert testimony, and in great detail, the alleged cause of the brachial plexus injury."

After they had deliberated six hours the jurors were instructed they could return a ten-vote majority verdict. They returned a ten-vote $125,000 verdict on the res ipsa loquitur claim with a note that read:

We the jury, want to make it clear, that being were [*sic*] finding in favor of the plaintiff, to a certain degree, we would like the court to understand, that we find the defendant not guilty of negligence *or of any wrongdoing. A victim of circumstances* (res ipsa loquitor [*sic*]).

The words we have emphasized were marked out on the original. It was signed by the jury foreman. The court inquired if the note represented the feeling of the ten who voted and signed the verdict. The reporter took down the response of one juror who said, "I don't think it was stated exactly the way we all meant it to be stated." The court then observed the note was not compatible with the verdict and requested the jury to resume its deliberations "after having read the Court's Instruction No. 12, numbered as pages 13 and 14 which is worded as clearly as the law permits." Instruction 12 was the instruction on res ipsa loquitur.

In the jury's absence defendant moved for a directed verdict on the basis of the note and took exception to further deliberation. Overruling the motion, trial court noted that the sense of the response to the court's inquiry disclosed the note did not properly express the views of the ten verdict signers. Defendant also objected to trial court's directions to consider one specific instruction. Trial court responded:

Well, you may be right. But, it was in the Court's mind that the jury, because of the language that had been crossed out, were under the impression that res ipsa loquitur was some sort of circumstance where there was no negligence but the man was liable anyhow. And, frankly, the objective of the Court's instruction to reread it was for them to see that res ipsa loquitur not only did not absolve establishing negligence, but only generated an inference of negligence if all the necessary elements required for the Plaintiff to establish were present and none of the elements that the Defendant might establish were present. And that appeared to me, from the sense of the note, to be the place where the jury misunderstood their position.

After further deliberation the jury returned a ten-vote plaintiff's verdict on res ipsa for $125,000.

Defendant moved for judgment notwithstanding the verdict, and in the alternative for new trial, claiming the verdict and the note precluded a plaintiff's judgment on either count. He asserted the only evidence supporting plaintiff's res ipsa count was insufficient because it also supported the specific negligence allegations on which plaintiff did not prevail. Resisting, plaintiff offered affidavits of three of the majority jurors to show the note represented the views of the two dissenting jurors only. He argued the res ipsa submission had more than adequate evidential support.

> Trial court found the note
>
> was not the finding of the ten members of the jury signatory to the verdict and did not purport to be anything other than a note signed by the Foreman. The Reporter's notes show only one juror dissenting from the phraseology employed [in the note] but the Court heard several voices responding to his inquiry, all disavowing the phraseology employed in the note.

The post-verdict motions were overruled.

Appealing, defendant's principal issue is that the court should not have submitted the res ipsa loquitur claim to the jury. In separate divisions of his brief he asserts, under the whole record and the jury's finding in defendant's favor on specific negligence, trial court erred in overruling his post-verdict motions for judgment notwithstanding the verdict and for new trial.

Defendant's second and unrelated issue asserts trial court erred in submitting plaintiff's claim for future post-minority medical expenses.

### I. Res Ipsa Loquitur.

Defendant vigorously argues plaintiff's res ipsa loquitur cause of action should not have been submitted to the jury because it was supported only by the identical evidence which supported the three specifications of negligence submitted for the jury's consideration. He asserts that permitting the jury to consider the same evidence which supported the submitted specifications of negligence as also supporting the res ipsa claim gave the jury a forbidden "two bites at the apple." The second bite, defendant argues, came after the jury had already found plaintiff failed to establish a right to recover under this evidence as to the specified negligence. He additionally contends the doctrine is not applicable where, as here, plaintiff's evidence conclusively establishes all the facts and circumstances surrounding the occurrence, leaving for the court or jury only the question whether on such facts defendant should be charged with liability.

Plaintiff asserts he was entitled to plead specific negligence and general negligence (res ipsa loquitur) alternatively. He argues defendant's after-the-event analysis begs the question: He was entitled to plead both causes of action and go to the jury on both, for until the jury has spoken it cannot be known that specific negligence has been proved.

■ Our general rules relating to the doctrine of res ipsa loquitur are found in our prior decisions. *Northwestern National Insurance Co. v. Raid Quarries Corp.*, 249 N.W.2d 640, 644–45 (Iowa 1977); *Palleson v. Jewell Cooperative Elevator*, 219 N.W.2d 8, 13–14 (Iowa 1974). It is now well established that the doctrine may be applicable in a professional or semiprofessional medical service or treatment situation, *Frost v. Des Moines Still College of Osteopathy and Surgery*, 248 Iowa 294, 79 N.W.2d 306 (1956); Annot., 9 A.L.R.3d 1315 (1966); Annot., 82 A.L.R.2d 1262 (1962), including childbirth. *Larrabee v. United States*, 254 F.Supp. 613, 616 (S.D.Cal.1966) (res ipsa loquitur applied on expert evidence of standard of care and evidence indicating connection between forceps delivery and child's subsequent blindness); *Ragusano v. Civic Center Hospital Foundation*, 199 Cal.App.2d 586, 593, 19 Cal.Rptr. 118, 122 (1962); see Annot., 37 A.L.R.2d 1284, 1294–95 (1954).

■ For years we have permitted plaintiff to plead and trial court to submit to the

jury both specific negligence and general negligence under the res ipsa doctrine. *Eaves v. City of Ottumwa*, 240 Iowa 956, 967–68, 38 N.W.2d 761, 768 (1949); *see Grings v. Great Plains Gas Co.*, 260 Iowa 1309, 1317–18, 152 N.W.2d 540, 544 (1967); Annot., 2 A.L.R.3d 1335 (1965). The two theories ordinarily are to be submitted to the jury alternatively; if the jury finds for plaintiff on specific negligence it should not consider liability under the doctrine of res ipsa loquitur. *See Grings*, 260 Iowa at 1318, 152 N.W.2d at 544.

■ Formerly we held the res ipsa inference of negligence could not be relied on unless within the *common* experience of lay persons the occurrence was such that in the ordinary course of things it would not have happened if reasonable care had been used. *See Lagerpusch v. Lindley*, 253 Iowa 1033, 1037–38, 115 N.W.2d 207, 210 (1962). The current rule in Iowa and many other jurisdictions is that this common experience may include the common experience of experts. *Perin v. Hayne*, 210 N.W.2d 609, 614–15 (Iowa 1973); *see, e. g., Wolfsmith v. Marsh*, 51 Cal.2d 832, 835, 337 P.2d 70, 72 (1959); *Walker v. Rumer*, 51 Ill.App.3d 1005, 1007–08, 9 Ill.Dec. 724, 727, 367 N.E.2d 158, 161 (1977), *aff'd*, 72 Ill.2d 495, 21 Ill.Dec. 362, 381 N.E.2d 689 (1978); *Gould v. Winokur*, 98 N.J.Super. 554, 567–68, 237 A.2d 916, 923 (L.Div.1968), *aff'd*, 104 N.J.Super. 329, 250 A.2d 38 (App.Div.), *cert. denied*, 53 N.J. 582, 252 A.2d 157 (1969); *Swanson v. Brigham*, 18 Wash.App. 647, 650, 571 P.2d 217, 219 (1977); W. Prosser, *Law of Torts* § 39, at 217, 227 (4th ed. 1971).

■ It is true that res ipsa loquitur does not apply where there is direct evidence as to the precise cause of the injury and all the facts and circumstances attending the occurrence appear. *McKee v. New York Central Railroad*, 355 F.2d 165, 167 (6th Cir. 1966) ("[P]laintiff's proofs here establish the defective condition of the bridge without the necessity of applying the doctrine of res ipsa loquitur."); *Augspurger v. Western Auto Supply Co.*, 257 Iowa 777, 781, 134 N.W.2d 913, 916 (1965) ("Here plaintiff testified in detail about the acci-

dent and its cause. He even knew the type of chisel and hammer used and the kind of axle involved. The evidence was equally accessible to both parties. There were no unknown factors."); Annot., 9 A.L.R.3d 1315, 1340 (1966). In cases like these the underlying reason frequently advanced for application of the res ipsa doctrine is not present: that is, the chief evidence of the true cause of plaintiff's injury is practically inaccessible to plaintiff but accessible to defendant. *Smith v. Ullerich*, 259 Iowa 797, 805, 145 N.W.2d 1, 6 (1966); *Eaves*, 240 Iowa at 972, 38 N.W.2d at 770. However, proof of the cause of an injury or loss will not necessarily avoid application of the res ipsa doctrine. *Wilson v. Paul*, 176 N.W.2d 807, 809–11 (Iowa 1970) (plaintiff showed probable cause of fire was defendant's torch; case reversed for failure to submit res ipsa loquitur theory). Care should be taken to distinguish those situations in which evidence of the cause of an injury or loss is so strong and extensive as to leave nothing for inference and those which establish the cause but still raise only an inference as to defendant's negligence. *See Di Mare v. Cresci*, 58 Cal.2d 292, 299–300, 23 Cal.Rptr. 772, 776, 373 P.2d 860, 864 (1962); W. Prosser, *supra* § 39, at 217 ("In many cases the inference to be drawn is a double one, that the accident was caused in a particular manner, and that the defendant's conduct with reference to that cause was negligent. But the inference of negligence may also arise where a definite cause is known . . . .") (footnotes omitted); Annot., 33 A.L.R.2d 791, 793 (1954).

The controversial area is approached when plaintiff's evidence tending to prove specific acts of negligence is so strong there is little left to infer through application of the res ipsa doctrine. We start from the premise articulated in *Eaves*, 240 Iowa at 968, 38 N.W.2d at 768:

> If a plaintiff is permitted to plead in separate counts both specific negligence and general negligence as a basis for the application of the res ipsa doctrine *the mere introduction of evidence to support the specific allegations* or the submission

thereof to the jury *should not render such doctrine inapplicable.* Not until the jury has spoken can it be known whether plaintiff has succeeded in establishing the specific negligence charged.

(Emphasis added.) An appealing policy consideration is involved:

> We think that in cases in which a plaintiff is entitled to rely on the doctrine of res ipsa loquitur, he should not be penalized by the loss of the presumption because he has been willing to go forward and do the best he can to prove specific acts of negligence. On the contrary he should be encouraged to give the court, the jury, and even the defendant the benefit of whatever facts, if any, his efforts may develop toward revealing the specific causes of the mishap.

*Hugo v. Manning,* 201 Kan. 391, 398, 441 P.2d 145, 151 (1968). *See also Ozark v. Wichita Manor,* 258 F.2d 805, 806 (5th Cir. 1958); *Ballhorst v. Hahner-Foreman-Cale, Inc.,* 207 Kan. 89, 99, 484 P.2d 38, 46 (1971).

Other jurisdictions have adopted various rules relating to this problem. In Washington the res ipsa doctrine may be applied if plaintiff's testimony goes no further than to suggest how the injury could have, and probably did, occur, but not "when a general charge of negligence is *fully explained* by plaintiff's evidence." *Kemalyan v. Henderson,* 45 Wash.2d 693, 703, 277 P.2d 372, 377 (1954) (emphasis in text). Alaska does not preclude use of the doctrine unless the evidence discloses the circumstances of the injury or loss to the extent of a "complete explanation," leaving nothing left to infer. *Widmyer v. Southeast Skyways, Inc.,* 584 P.2d 1, 11 (Alaska 1978). In California the plaintiff is not deprived of the benefit of the res ipsa loquitur doctrine "unless the facts as to the cause of the accident and the care exercised by the defendant are shown as a matter of law thus eliminating any justification for resort to the inference of negligence." *DiMare v. Cresci,* 58 Cal.2d at 299, 23 Cal.Rptr. at 776, 373 P.2d at 864. Kansas has rejected the California rule, opting for withholding the doctrine where "[p]ositive evidence . . . establishes

that the plaintiff understands the cause of the injury." *Hugo v. Manning,* 201 Kan. at 397, 441 P.2d at 150–51. *See generally* W. Prosser, *supra* § 40, at 232:

> [I]t is quite generally agreed that the introduction of some evidence which tends to show specific acts of negligence on the part of the defendant, but which does not purport to furnish a full and complete explanation of the occurrence does not destroy the inferences which are consistent with the evidence, and so does not deprive the plaintiff of the benefit of res ipsa loquitur.

*See also* Annot., 33 A.L.R.2d 791 (1954).

■ Although the issue is a close one, we find that under the above principles trial court was right in permitting the jury to consider the inference of negligence under the doctrine of res ipsa loquitur. Weighing in the balance defendant's concessions, the evidence relating to the *cause* of stretch injury to plaintiff's brachial plexus is overwhelming: traction applied to plaintiff's head in the course of his birth. But there remains unresolved the question of defendant's alleged negligence in this regard. Here the evidence was sufficient to raise an inference of defendant's negligence, particularly in view of the testimony of the expert, Dr. Davis, that brachial plexus injury to an infant during vertex delivery complicated by shoulder dystocia is the result of obstetrical negligence.

■ Although defendant's experts testified such injuries have been reported in uneventful births, none testified he ever saw such an instance. Of course, rarity of the occurrence is not a sufficient predicate for application of the res ipsa loquitur doctrine, *Perin,* 210 N.W.2d at 615. The relevant portion of the test is whether the occurrence is such as in the ordinary course of events would not happen if reasonable care had been used. *Eaves,* 240 Iowa at 969–70, 38 N.W.2d at 769. As we have noted, there is expert testimony in this record that such injuries do not happen in the *"ordinary* course of events" without negligence. This was an issue properly left to the jury under trial court's instruction on res ipsa loquitur.

Although there was substantial evidence to support plaintiff's allegation his injury could not have occurred but for the negligent conduct of defendant, we do not believe it went so far as to pinpoint the precise cause of the injury and all the facts and circumstances attending the occurrence. See Augspurger, 257 Iowa at 781, 134 N.W.2d at 916. Only defendant was in position to furnish all facts and circumstances surrounding the incident. As a matter of policy, we do not believe a plaintiff who has produced all the evidence he or she has available should be penalized by being deprived of the res ipsa loquitur doctrine he or she would otherwise be permitted to rely on, unless that evidence fully explains all the facts and circumstances surrounding the incident. In this instance the evidence did not go that far.

■ Nor do we find anything that happened subsequent to the submission of the case to the jury merits reversal. The act of trial court in sending the jury back for further deliberations was not an abuse of discretion but within its inherent power to manage the trial and jury and assure completion of its work. See Rutledge v. Johnson, 282 N.W.2d 111, 114 (Iowa 1979); Oxford Junction Savings Bank v. Cook, 134 Iowa 185, 191–94, 111 N.W. 805, 807–08 (1907). A similar power has found expression in Iowa R.Civ.P. 206, which provides in relevant part, "If the answers [to interrogatories] are inconsistent with each other, and any is inconsistent with the [general] verdict, the court shall not order judgment, but either send the jury back or order a new trial."

We hold there was no reversible error relating to the issue of res ipsa loquitur.

## II. Post-minority medical expenses.

The claim of plaintiff's father for damages for plaintiff's medical expenses during the latter's minority was dismissed on summary judgment based on the statute of limitations. Plaintiff also claimed damages for post-minority medical damages. His future medical expense in the maximum amount of $2200 was estimated in a Mayo Clinic letter stipulated into evidence. Defendant took exception to the instruction submitting this damage element to the jury on the ground there was no evidence on which the jury could find the indicated future surgery would be required after majority. Trial court agreed there was no evidence as to when the expenses would be incurred, but overruled the exception. The jury was therefore permitted to allow plaintiff

> [d]amages that will be sustained as a result of medical, hospital and related expenses that will probably be incurred by Plaintiff after he attains his majority for the treatment of the injury. Such amount shall not exceed the amount shown by the evidence with reasonable certainty.

■ A minor may only recover for those future medical expenses which will be incurred after majority, absent assignment by the parent. Gookin v. Norris, 261 N.W.2d 692, 693 (Iowa 1978). We have held a plaintiff seeking to recover the cost of future medical treatment must furnish legally adequate proof that he or she will require such treatment, and of its cost. Shover v. Iowa Lutheran Hospital, 252 Iowa 706, 723, 107 N.W.2d 85, 95 (1961). It seems equally apparent plaintiff must also show whether the treatment probably will be incurred after he reaches his majority, when that evidence will control whether the damage claim will be his or the property of another.

■ Plaintiff's proof failed in this respect. If there is an inference to be drawn from testimony of his parents and his Mayo Clinic doctor relating to his continual treatment, it would be that this medical expense would be incurred during his minority. Plaintiff's brief does not assert there was any proof this expense would be incurred after he reaches his majority. He simply urges the question is one "properly assigned to the jury." We do not agree.

Defendant urges this error requires the entire verdict and judgment to be set aside and a new trial ordered. He relies on Shover, 252 Iowa at 724, 107 N.W.2d at 95,

where we so held when plaintiff's unsupported claim for future medical expense ranged from $21,000 to well over $30,000 and the total verdict was $74,051. In this case we have no reason to believe the jury's $125,000 verdict included more than $2200 in future medical expense. Nor do we have any assurance the jury did not find these damages would not be incurred during plaintiff's minority and therefore awarded nothing in this respect.

Neither can we concur with plaintiff's suggestion that "the proportionate relationship of the amount of projected expenses [to] the damages ultimately awarded is so insubstantial that this Court could well overlook this particular issue on review."

In this situation there is authority to support a reversal and remand on the issue of damages alone. *Barry v. State Surety Co.*, 261 Iowa 222, 230, 154 N.W.2d 97, 102 (1967); *Dailey v. Holiday Distributing Corp.*, 260 Iowa 859, 878, 151 N.W.2d 477, 489–90 (1967). However, our overview of all the circumstances of this appeal persuades us justice would be better served and this litigation appropriately terminated by affirming upon the condition plaintiff file a remittitur in district court in the sum of $2200. If plaintiff files such remittitur within ten days from issuance of procedendo this case shall stand affirmed. If it is not filed trial court is directed to grant defendant's motion for new trial, on all issues. *See Sauer v. Scott*, 176 N.W.2d 140, 147 (Iowa 1970); *Miller v. Town of Ankeny*, 253 Iowa 1055, 1064, 114 N.W.2d 910, 915 (1962); Iowa R.App.P. 26. Costs are taxed to defendant.

AFFIRMED ON CONDITION.

All Justices concur except LeGRAND, J., who dissents.

LeGRAND, Justice (dissenting).

I dissent from Division I and from the result because under this record the case should not have been submitted to the jury on the doctrine of res ipsa loquitur. The majority passes this off by saying it was a "close issue." Really there was *no* issue.

Any doubt about this was resolved by what happened during jury deliberations. The jury first returned a verdict saying it found for the plaintiff but "we find the defendant not guilty of negligence."

In the face of that finding, it was improper to send the jury back to deliberate further. The only conclusion the jury could draw was that it *should* find negligence—which, of course, it promptly did.

None of this would have occurred if the court, as it should have done, had refused to submit the res ipsa count.