Dorothy A. WICK and Richard
S. Wick, Appellants,

v.

Marvin G. HENDERSON, Mercy Hospital, and Medical Anesthesia Associates, P.C., Appellees.

No. 90–1667.

Supreme Court of Iowa.

May 13, 1992.

Rehearings Denied June 18, 1992.

James R. Welsh, Omaha, Neb., and Stephen A. Rubes, Council Bluffs, for appellants.

Marvin F. Heidman and John C. Gray of Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, Sioux City, for appellees Marvin G. Henderson, M.D., and Medical Anesthesia Associates, P.C.

Michael F. Kinney and David A. Blagg, Omaha, Neb., for appellee Mercy Hosp.

ANDREASEN, Justice.

The trial court directed a defendants' verdict in this medical malpractice suit against an anesthesiologist, a professional corporation, and the hospital where surgery had been performed. Plaintiffs' appeal presents questions on the sufficiency of the evidence to support claims based both on allegations of specific negligence and on the theory of *res ipsa loquitur.* We reverse and remand.

Plaintiff Dorothy Wick entered defendant Mercy Hospital as a patient on August 12, 1987, for gallbladder surgery. Defendant Marvin G. Henderson, a medical doctor specializing in anesthesiology, was employed at the time by defendant Medical Anesthesia Associates, P.C. (MAA). There is no claim or showing that Henderson was personally present during Wick's surgery; it was attended by James Byrk, a nurse anesthetist who was also employed by MAA. Henderson was one of three anesthesiologists employed by MAA. He was on duty in a supervisory capacity in the operating area at the hospital at the time. Henderson was listed on hospital documents by Byrk as the anesthesiologist for Wick's surgery.

After Wick was taken to an operating room she was positioned with her back on the operating table and her arms outstretched in what was described as a "crucifix position." The testimony shows that it was necessary to properly position the

arm of a patient in this position to avoid damage to the ulnar nerve. Wick's arms rested on padded extensions that jutted from each side of the operating table. She testified the position caused an uncomfortable feeling to her left arm and shoulder, but she did not communicate this discomfort to anyone. Wick was then placed under anesthesia, and the operation proceeded.

The next thing Wick remembered was waking up in her hospital room. She had no recollection of being taken from the operating room nor did she remember being in the recovery room. Wick had been under a general anesthesia for two and one-quarter hours.

Wick had pain in her left arm upon awakening. She complained of pain and testified the pain was severe and continuing while she was in the hospital. When discharged from the hospital on August 17, 1987, she was told by an anesthesiologist in the hospital that her arm was "stressed" during surgery.

According to her evidence, she sustained a permanent injury to the ulnar nerve located in her upper left arm. She claims damages for a disfiguring scar, a result of corrective surgery, for pain, and for medical expenses, past and future. She sought recovery on theories of specific negligence and *res ipsa loquitur* against Henderson, MAA, and Mercy. For simplicity, we omit discussion of the loss-of-consortium claim made by Wick's husband.

At trial, Wick presented testimony of both defendant Henderson and Dr. Alfredo Socarras. Henderson testified he was a supervisor of nurse anesthetists at Mercy. As to the proper standard of care, it was his opinion that either a nurse anesthetist or anesthesiologist is responsible for the proper positioning of a patient's arm during surgery. In the instant case, Henderson believed that Byrk, the nurse anesthetist, had the responsibility to properly position and pad Wick's arm to protect against ulnar nerve injury.

Socarras completed his medical education in Cuba in 1952. He interned at Mercy Hospital in Des Moines from 1955–57 and at the Mayo Clinic in Rochester, Minnesota, from 1957–60. He is a licensed physician and surgeon in Iowa and for the past thirty years has maintained a practice in neurology in Des Moines.

Socarras testified as to his extensive experience in the field of neurology and to his attendance at seminars, symposiums, and other meetings at which ulnar nerve problems were discussed. He was familiar with medical writings and studies relating to ulnar nerve injuries during surgery. He described the nervous system and offered a detailed description of the ulnar nerve. He stated the damage to the ulnar nerve could result if the patient were not properly positioned and monitored during surgery.

Socarras testified it was the responsibility of the anesthesiologist or anesthetist to position the patient and then monitor the position of the patient during surgery. In his opinion, the main cause of ulnar nerve injury during surgery is the mechanical compression of the nerve by improper positioning of the arm.

Based upon his review of the depositions and records in the case, Socarras offered opinions on how Wick's ulnar nerve was damaged. He concluded that Byrk failed to properly monitor the position of her arm during surgery. On cross-examination Socarras conceded the injury could also have happened if a surgeon leaned against the patient's arm for a period of time.

At the close of Wick's case, all defendants moved to strike the testimony of Socarras. Mercy also moved for a directed verdict. Before considering the motion to strike, the court granted Mercy's motion for a directed verdict and dismissed the case against it. The court then sustained, in part, the motion to strike and thereafter granted Henderson and MAA a directed verdict resulting in the dismissal of Wick's case.

## I. *Directed Verdict.*

The trial court granted defendants' motion for directed verdict at the close of Wick's evidence. On ruling on a motion for directed verdict, the evidence must be

viewed in the light most favorable to the party against whom the motion was made, regardless of whether it was contradicted. Iowa R.App.P. 14(f)(2). Where substantial evidence has been presented in support of each element of a claim, a motion for directed verdict should be denied. *Reuter v. State Farm Mut. Auto. Ins. Co.*, 469 N.W.2d 250, 251 (Iowa 1991). The court must draw every legitimate inference in aid of the evidence. *Id.*

The court's directed verdict rulings were influenced by the court's ruling on the defendants' motion to strike Socarras's testimony. The court found Socarras "is certainly qualified as a neurologist and qualified to give the opinions that he gave with respect to ulnar nerve injuries." However, the court found Socarras did not qualify under Iowa Code section 147.139 (1989) "to give the opinions that he gave with respect to the responsibility of the anesthetist to monitor the position, the location, and pressure against the patient's arm during surgery." This testimony was then stricken by the court with the additional comment that, if the court incorrectly assumed section 147.139 applied, the testimony would be stricken because Socarras was not qualified to express an opinion as to the standard of care of the anesthetist. We believe the trial court abused its discretion in striking the testimony of Socarras.

■ We are committed to a liberal rule on admissibility of opinion testimony. *De-Burkarte v. Louvar*, 393 N.W.2d 131, 138 (Iowa 1986). A physician need not be a specialist in a particular field of medicine to give an expert opinion. *Id.* An expert witness must be not only generally qualified in a field of expertise; but must also be qualified to answer the particular question propounded. *Tappe v. Iowa Methodist Medical Ctr.*, 477 N.W.2d 396, 402 (Iowa 1991). We believe the trial court committed a manifest abuse of discretion by striking Socarras's testimony.

■ The trial court's reliance on Iowa Code section 147.139 also is misplaced. This statute provides:

> If the standard of care given by a physician and surgeon licensed pursuant to chapter 148, or osteopathic physician and surgeon licensed pursuant to chapter 150A, or a dentist licensed pursuant to chapter 153, is at issue, the court shall only allow a person to qualify as an expert witness and testify on the issue of the appropriate standard of care if the person's medical or dental qualifications relate directly to the medical problem or problems at issue and the type of treatment administered in the case.

It obviously applies only to the professions it lists. The hospital and the nurse anesthetist are not protected by its provisions. Socarras, a qualified neurologist, is qualified to testify as to the cause of injury to the ulnar nerve during surgery based upon his medical education and experience, his research and study, his review of medical publications and writings in this field, and his review of the facts and circumstances of this case.

■ The trial court also failed to recognize that expert testimony as to the standard of care is not required when a layperson is competent to pass judgment and conclude from common experience that the injury to the nerve would not have happened if proper skill and care were provided. *Sammons v. Smith*, 353 N.W.2d 380, 385 (Iowa 1984). When the foundation facts of *res ipsa loquitur* are established—whether by expert testimony or, in the proper case, by the common experience of laypersons—then the plaintiff is not required to present expert testimony on the appropriate standard of care. *Welte v. Bello*, 482 N.W.2d 437, 439 (Iowa 1992).

## II. *Res Ipsa Loquitur Doctrine.*

■ We were one of the first jurisdictions to hold the doctrine of *res ipsa loquitur* was applicable in medical and dental malpractice cases. *Whetstine v. Moravec*, 228 Iowa 352, 291 N.W. 425 (1940). The *Whetstine* decision was cited in the landmark case of *Ybarra v. Spangard*, 25 Cal.2d 486, 489, 154 P.2d 687, 689 (1944). We consider the doctrine to be a rule of evidence rather than one of pleading or substantive law. *Wiles v. Myerly*, 210 N.W.2d 619, 624 (Iowa 1973). The doctrine

does not relieve plaintiff's burden to prove negligence. *Id.* Rather, it permits, but does not compel, a fact finder to infer negligence from the occurrence of an injury. *Id.* The plaintiff must prove two foundational facts in order to invoke the doctrine of *res ipsa loquitur:* (1) the defendants had exclusive control and management of the instrument that caused plaintiff's injury, and (2) it was the type of injury that ordinarily would not occur if reasonable care had been used. *Welte,* 482 N.W.2d at 440; *Tappe,* 477 N.W.2d at 399. *See also Frost v. Des Moines Still College of Osteopathy & Surgery,* 248 Iowa 294, 302–03, 79 N.W.2d 306, 312 (1956) (application of the doctrine of *res ipsa loquitur* is not prevented because the injury may have been caused by the separate acts of any of the defendants).

Because the doctrine allows an inference of negligence without specific proof, we have been cautious with the doctrine's requirements before applying it. *Tappe,* 477 N.W.2d at 399–400. This has been particularly true in medical malpractice cases, in which the health care provider cannot control the physical condition and reactions of a patient. *Id.* When the requirements of *res ipsa loquitur* are met, however, we have not hesitated to apply the doctrine. *See, e.g., Wiles,* 210 N.W.2d at 629.

### III. *Res Ipsa Loquitur—Control.*

Our recent cases discussing *res ipsa loquitur* in medical malpractice cases, especially *Welte* and *Tappe,* have turned on the second element of the doctrine: injury of a type that ordinarily would result only from negligence. The issue raised in this case and relied upon by the trial court in its ruling related to the first element of the doctrine.

The exclusive control requirement was addressed in *Ybarra.* There, the California Supreme Court recognized that in a modern hospital a patient would quite likely come under the care of a number of persons in different types of contractual and other relationships to each other. 25 Cal.2d at 491, 154 P.2d at 690. The court expressed concern that the *res ipsa* doctrine has occasionally been transformed into a rigid legal formula. *Id.* at 489–90, 154 P.2d at 689. The court stated:

Plaintiff was rendered unconscious for the purpose of undergoing surgical treatment by the defendants; it is manifestly unreasonable for them to insist that he identify any one of them as the person who did the allegedly negligent act.

The other aspect of the case which defendants so strongly emphasize is that plaintiff has not identified the instrumentality any more than he has the particular guilty defendant. Here, again, there is a misconception which, if carried to the extreme for which defendants contend, would unreasonably limit the application of the *res ipsa loquitur* rule. It should be enough that the plaintiff can show an injury resulting from an external force applied while he lay unconscious in the hospital; this is as clear a case of identification of the instrumentality as the plaintiff may ever be able to make.

An examination of the recent cases, particularly in this state, discloses that the test of actual exclusive control of an instrumentality has not been strictly followed, but exceptions have been recognized where the purpose of the doctrine of *res ipsa loquitur* would be otherwise defeated. Thus, the test has become one of right of control rather than actual control.

*Id.* at 492–93, 154 P.2d at 690–91.

In *Frost,* we adopted the *Ybarra* reasoning:

We think it is a just and logical conclusion that one who, while undergoing a surgical operation, sustains an unusual injury to a healthy part of his body not within the area of the operation, be not precluded from invoking the doctrine of *res ipsa loquitur* in an action against the doctors and nurses participating in the operation. The same thing must be said of the corporate hospital regarding its preceding or subsequent care of the patient. This is not altered by the fact that all the parties do not stand in such relation to one another that the acts of one may be regarded as the acts of the other,

and that the injury may have been caused by the separate acts of any one of them, or by the fact that there were several instrumentalities and no showing as to which caused the injury or as to the particular defendant in control of it.

*Frost*, 248 Iowa at 302–03, 79 N.W.2d at 312. We specifically reiterated this principle in *Wiles*. 210 N.W.2d at 629.

As is also suggested in *Prosser*:

This element usually is stated as meaning that the defendant must be in "exclusive control" of the instrumentality which has caused the accident. Such control of course does serve effectively to focus any negligence upon the defendant; but the strict and literal application of the formula has led some courts to ridiculous conclusions, requiring that the defendant be in possession at the time of the plaintiff's injury—as in the Rhode Island case denying recovery where a customer in a store sat down in a chair, which collapsed. Of course this is wrong: it loses sight of the real purpose of the reasoning process in an attempt to reduce it to a fixed, mechanical and rigid rule. "Control," if it is not to be pernicious and misleading, must be a very flexible term. It may be enough that the defendant has the right or power of control, and the opportunity to exercise it. . . . It is enough that the defendant is under a duty which he cannot delegate to another, as in the case of a surgeon who allows a nurse to count the sponges.

W. Prosser & W. Keeton, *Prosser & Keeton on Torts* § 39, at 249–50 (5th ed. 1984).

 The requirement of exclusive control in medical malpractice may be satisfied by concurrent or joint control, as in *Sammons*, 353 N.W.2d at 387–88, or based in part on vicarious liability, as in *Frost*, 248 Iowa at 304, 79 N.W.2d at 313. However, under certain circumstances, the *res ipsa* doctrine may apply when responsibility is unallocated, as in *Ybarra*. *See* Annotation, *Applicability of Res Ipsa Loquitur in Cases of Multiple Medical Defendants—Modern Status* 67 A.L.R.4th 544 § 9 (1989 & Supp.).

**IV. *Other Issues.***

 Wick offered substantial evidence to support the submission of specific acts of negligence. However, proof of the cause of an injury does not necessarily avoid application of the *res ipsa* doctrine. *Reilly v. Straub*, 282 N.W.2d 688, 694 (Iowa 1979). The court must carefully distinguish those situations in which evidence of the cause of an injury is so strong and extensive as to leave nothing for inference and those which establish the cause but still raise only an inference as to the defendant's negligence. *Id.* The mere introduction of evidence to support the specific negligence allegations does not render the *res ipsa* doctrine inapplicable. *Id.* at 694–95. This determination should be made after all evidence has been received and all parties have rested their case. The court should submit and instruct the jury upon those specific acts of negligence which are supported by substantial evidence.

**V. *Disposition.***

 The trial court erred in striking Socarras's testimony and in directing verdicts for all defendants. Accordingly, we reverse and remand for a new trial. On retrial, the district court should be mindful that "[t]here are [ ] medical and surgical errors on which any lay[person] is competent to pass judgment and conclude from common experience that such things do not happen if there had been proper skill and care." *Prosser & Keeton on Torts* § 39, at 256. This is such a case. It is within the common knowledge and experience of a layperson to determine that an individual does not enter the hospital for gallbladder surgery and come out of surgery with an ulnar nerve injury to the left arm. *See Swierczek v. Lynch*, 237 Neb. 469, 466 N.W.2d 512 (1991) (court reached same conclusion as to patient who entered hospital for extraction of his teeth and came out of surgery with an ulnar nerve injury).

REVERSED AND REMANDED.

All Justices concur except HARRIS, J., who is joined by McGIVERIN, C.J., CARTER and SNELL, JJ.

HARRIS, Justice (dissenting).

Because I disagree with both majority holdings, I respectfully dissent. I believe the trial court acted within its broad discretion in striking Dr. Socarras' testimony. I also think the *res ipsa loquitur* claim was correctly dismissed because defendants were not shown to be in exclusive control.

I. *Socarras testimony.* Before acting on the motion to dismiss the claims against Henderson and MAA, the trial court considered defendants' motion to strike the testimony of Dr. Socarras that nurse anesthetists and anesthesiologists have a duty to monitor the position of a patient's arm while the patient is under anesthesia. This testimony was of course crucial to plaintiff's specific negligence claim against Henderson and MAA. According to Socarras this duty includes making sure no improper pressure is placed on a patient's arm. This opinion was struck because the trial court concluded Socarras was not qualified to offer it.

I think the ruling should be affirmed under common law standards for admitting expert testimony. Under a de novo review, perhaps even under a review on error, I might agree with the majority in favoring admission. But we should pay more than lip service to the stated scope of review.

Our cases are legion that hold the standard for admissibility of expert testimony is discretionary; we have said we do not reverse in the absence of "manifest abuse of that discretion." Among cases reciting this familiar principle is the one cited by the majority, *DeBurkarte v. Louvar*, 393 N.W.2d 131, 138 (Iowa 1986).

Socarras gave only these qualifications for stating the standard of care to which an anesthesiologist or nurse anesthetist must adhere: (1) his training in medical school; (2) his internship; (3) his reading on how damage to the ulnar nerve occurs; and (4) some procedures involving anesthesia he observed. The trial court observed that, after the doctor's medical education in Cuba, "the record does not reflect any substantial experience, education or training for the past thirty years in surgery or anesthesiology or the relationship between the two sufficient to qualify him to render the opinions...."

I cannot find manifest abuse in the ruling. Although Socarras did show extensive training and experience in neurology, he had little training in anesthesiology, except for the exposure which occurred during medical school in Cuba, and during his internship. His experience in anesthesia in the decades since then was limited to what he observed from his own capacity in operating rooms. Although he claimed he continued to educate himself in the field of anesthesiology, his testimony revealed only that he has studied the sources of damage to nerves, including damage to nerves during surgery.

Socarras did not testify that these sources contained any reference to the standard of care owed by an anesthesiologist or anesthetist. Neither did Socarras testify that, after the thirty years since his internship, he had taken the time to review the current standards applicable to anesthesiologists or anesthetists. It seems clear to me that the trial court did not abuse its discretion in finding he provided no substantial basis for his claim that he knew the standard of care for anesthesiologists or anesthetists.

Without the Socarras testimony there was insufficient evidence to support a jury case against Henderson or MAA on any theory of specific negligence.

II. *Res ipsa loquitur.* The *res ipsa loquitur* claim must fall in the absence of either required element. The plaintiff must prove two foundational facts in order to invoke the doctrine of *res ipsa loquitur:* (1) the defendants had exclusive control and management of the instrument that caused plaintiff's injury; and (2) it was the type of injury that ordinarily would not occur if reasonable care had been used. *Welte v. Bello*, 482 N.W.2d 437, 439 (Iowa 1992); *Tappe v. Iowa Methodist Medical Ctr.*, 477 N.W.2d 396, 399 (Iowa 1991).

Because the doctrine allows an inference of negligence without specific proof, we have been cautious with the doctrine's requirements before applying it, especially in

medical malpractice cases. *Tappe*, 477 N.W.2d at 399–400 ("Because the doctrine creates an inference of negligence without specific proof, it traditionally has been applied sparingly, especially in medical malpractice cases.").

It is apparent from our recent opinions on the subject that this stated reluctance to apply the *res ipsa* doctrine in medical malpractice cases does not enjoy our unanimous endorsement. But, although we encounter obvious difficulty in reaching a consensus, I think the reluctance is grounded in sound public policy. The reluctance proceeds from a recognition that fundamental physical conditions and reactions of patients, even those of tragic dimensions, are often beyond the control of any physician. *Morgensen v. Hicks*, 253 Iowa 139, 143, 110 N.W.2d 563, 565–66 (1961) (cited in *Tappe*, 477 N.W.2d at 400). To say that *res ipsa* should be applied with reluctance in medical malpractice cases means it should not be applied in close cases. This is a close case.

I think the directed verdicts should be affirmed because the plaintiff did not establish exclusive control on the part of any defendants. This is because of the other medical personnel present in the operating room who were not named as defendants (the surgeon and the assistants). Wick's own expert testified it was just as likely that Wick's injury was caused by one of these other persons as it was by any failing on the part of the nurse anesthetist, Jim Byrk. The rule has been explained:

> If it appears that the [injury] was, or might have been, in part due to the act of a third person over whom the defendant had no control, the doctrine is not applicable.

57B Am.Jur.2d *Negligence* § 1876, at 543 (1989). *See also* Annotation, *Medical Malpractice: Res Ipsa Loquitur in Negligent Anesthesia Cases*, 49 A.L.R.4th 63, 192 § 68 (1986). The majority claims the exclusive element was met on the basis of Byrk's duty to monitor. As previously mentioned, I would affirm the trial court ruling striking the testimony of Dr. Socarras that Byrk had such a duty.

The trial court correctly reasoned that, because people other than defendants might well have caused Wick's injury, the element of exclusive control was not met.

I would affirm.