Erma A. SAMMONS and Merlyn
Sammons, Appellants,

v.

Koert R. SMITH, Wilfrido Calderon and
Burlington Medical Center, Appellees.

No. 69345.

Supreme Court of Iowa.

July 18, 1984.

Rehearing Denied Aug. 16, 1984.

William C. Ball and Jay A. Nardini of Ball, Kirk & Holm, P.C., Waterloo, for appellants.

Robert V.P. Waterman of Lane & Waterman, Davenport, for appellee Koert R. Smith.

Michael H. Figenshaw of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellee Wilfrido Calderon.

Ralph D. Sauer of Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, for appellee Burlington Medical Center.

Considered by REYNOLDSON, C.J., and UHLENHOPP, HARRIS, McGIVERIN, and CARTER, JJ.

REYNOLDSON, Chief Justice.

The fighting issues in this medical malpractice case involve application of the res ipsa loquitur doctrine and certain jury instructions. The court of appeals reversed a judgment for defendants based on the jury's verdict. We granted further review and now affirm the court of appeals ruling, and remand for new trial.

In late 1976 plaintiff Erma Sammons[1] consulted Dr. Rankin, her family physician at Mt. Pleasant, Iowa. She then had a two-year history of intermittent pain and swelling in her right knee. Ultimately this doctor referred her to defendant Dr. Koert Smith, a board-certified orthopedic surgeon at Burlington, Iowa.

Plaintiff first met with Dr. Smith on February 25, 1977. Tests revealed torn cartilage in plaintiff's knee. She elected to undergo a meniscectomy operation to remove it.

Dr. Smith informed plaintiff of the possible risks of the surgery including infection, thrombophlebitis (blood clots in the leg), increased risk of degenerative arthritis, and adverse reaction to the anesthetic. He did not suggest the possibility of postoperative nerve damage because of "the very remote likelihood that that happens."

March 31, 1977, Dr. Smith operated on plaintiff's knee. This involved removing the torn cartilage "cushion" in the knee joint through two incisions, one in front and one in the back of the knee. During this surgery an automatic, air-inflated tourniquet was applied to plaintiff's upper right leg, to cut off the supply of blood at the surgery site.

Although Dr. Smith testified he did not remember plaintiff's operation specifically, he assumed the tourniquet cuff was applied by the operating room nurse, an employee of defendant Burlington Medical Center, set at his own direction (here to 500 millimeters of mercury pressure), and monitored by the anesthesiologist, Dr. Calderon, or by the operating room nurse. There was nothing in the operative record that disclosed anything unusual had occurred during the two-hour surgery.

Upon regaining consciousness, plaintiff complained of numbness in her right foot and inability to move her toes. Dr. Smith diagnosed the problem as a possible tourniquet ischemia: nerve damage resulting from shutting off the blood supply to the nerve during the surgery. Plaintiff was discharged from the hospital April 17, 1977, on crutches, and subsequently was fitted with a leg brace.

After her discharge, plaintiff continued to see Dr. Smith, but her condition did not improve. She then consulted Dr. Richard Neiman, a board-certified neurologist practicing in Iowa City. Dr. Neiman described plaintiff as having "somewhat of a pegged-like leg deformity." Her leg "would hang loose on down with loss of sensation." Dr. Neiman's electromyographic studies revealed "a woody-like consistency of the muscles of the anterior portion of the shin with essentially no evidence of any muscle activity." He concluded the peroneal and the tibial nerves had been damaged permanently, a conclusion uncontroverted in this record.

March 27, 1979, plaintiff and her husband sued Dr. Smith, Dr. Calderon and the Burlington Medical Center. They also sued Walter Kidde and Company, manufacturer of the tourniquet, but dismissed the action against that defendant immediately before trial. The petition alleged several specific acts of negligence against the doctors and the medical center, but also included counts grounded on the doctrine of res ipsa loquitur.

At trial plaintiff's family physician, Dr. Rankin, testified her damage was caused by ischemia sustained during her operation, and that during the 16 years he had treated plaintiff for various illnesses he observed nothing that would make her unusually susceptible to tourniquet pressure.

1. We refer to Erma Sammons as the only plaintiff, although Merlyn Sammons, her husband, joined in this litigation with his cause of action for loss of consortium.

Neurologist Neiman testified the injury occurred during the operation and "the most likely cause was the tourniquet." He opined that tourniquet damage would result from either excessively long use or excessive pressure, although neither appeared in plaintiff's medical record. He stated "there was excessive pressure produced by the tourniquet, and this seemed to be the most likely cause of the injury." This witness testified he had discussed this opinion with defendant Dr. Smith, who agreed with it. Although Dr. Neiman testified he had "never seen a worse result," he felt "it would be unlikely" that the damage resulted from any abnormality on plaintiff's part. His final conclusion was that "something happened that was inordinate during the time of the surgery" and that "[t]his type of injury is not a normal consequence of knee surgery, and it would hopefully have been avoided if a proper care was taken." On cross-examination Dr. Neiman agreed the injury could have occurred despite the fact the doctors exercised due care in the surgery. He further agreed that "different people are susceptible and can be injured by different levels of pressure."

As an expert witness, plaintiff called Dr. Kurt Konkel, a board-certified orthopedic surgeon and medical college teacher in orthopedics. He opined plaintiff's injury would "not have happened if reasonable care had been used by ... the hospital personnel and physicians involved." He found "no evidence ... that would indicate that [plaintiff] had some vascular anomaly" and characterized the result as "an act of man rather than an act of God." This witness agreed that surgery was indicated, the use of the tourniquet was appropriate, and the stated usage of this device for almost two hours at 500 millimeters of mercury pressure was within (but at the outer limits of) acceptable procedure.

Dr. Konkel's examination of the medical records disclosed nothing to indicate plaintiff was unusually susceptible to tourniquet ischemia, or that either doctor had departed from accepted medical standards. He agreed the injury could have occurred despite Dr. Smith's due care. He opined the most likely cause of the injury was an inadvertent excess of tourniquet pressure that occurred as a result of improper calibration of the device. Less likely causes, in his judgment, were Dr. Smith's possible failure to examine the size, padding and placement of the tourniquet, and Dr. Calderon's possible failure to monitor the tourniquet gauge. He noted the tourniquet machine was outdated and that it should have been checked routinely by the medical center. He was firm in his conviction that the possibility of the injury being caused by some peculiar susceptibility of plaintiff rather than by an act of man was "considerably less" than one percent.

Dr. Smith testified in his own behalf. He considered it "possible" that the tourniquet had been miscalibrated and agreed that it was the mechanism that probably caused the injury. Although he found no medical evidence indicating plaintiff had an unusual susceptibility to tourniquet ischemia, he opined her injury was due to such an "anomaly." He did concede the "possibility" the injury was caused by human error and assigned malfunction of the tourniquet as a possible factor. He considered as far less likely the possibilities of a pressure point, error in setting the tourniquet gauge, or failure to monitor the tourniquet pressure.

Dr. Calderon testified it was the practice for him and the operating room nurses to monitor the tourniquet pressure. He did not recall who activated the tourniquet in this instance. He agreed it could have been excessive pressure at the tourniquet cuff that caused plaintiff's injury. Although his timing of tourniquet use was 1 hour 56 minutes, he offered no explanation for the reason the circulating nurse failed to fill out the tourniquet time on the operating record.

The medical center submitted the testimony of Donald Madsen, a professor of energy engineering at the University of Iowa. He testified the pressure gauge was a durable device and would not be at all

likely to drift. He opined the possibility of a change in calibration was "nil."

Trial court overruled defendant doctors' motions for directed verdict. The case against the doctors was submitted to the jury only upon the res ipsa loquitur theory. The case against the medical center went to the jury on allegations of specific negligence and alternatively, upon the jury's failure to find specific negligence, upon the theory of res ipsa loquitur as to that defendant.

After only two and one-half hours of deliberation, the jury returned a verdict in favor of all the defendants. Plaintiff's post-trial motions were overruled. She appealed and the court of appeals reversed and remanded for new trial. We granted further review and now affirm the court of appeals decision. The controlling issues are discussed in the following divisions.

### I. *Instruction 14B—Specific Negligence.*

Trial court's instruction 14 explained the res ipsa loquitur doctrine and provided its elements. The general duty of care of a specialist was explained in instruction 14B, which was identical with uniform instruction 13.3. In instruction 14B, however, the court submitted the following:

> You are instructed that a doctor cannot be found negligent merely because he makes a mistake in the treatment of a patient. Any error in treatment, if you find any, does not in and of itself constitute negligence. For a doctor to be found negligent, it must be shown by a preponderance of the evidence that the doctor, in treating the patient, failed to follow the customary practice and procedures of doctors under similar circumstances and in similar localities. This is the standard by which the doctors are to be judged.

Plaintiff objected there were no facts in the record to support instruction 14B, it was inapplicable in a "res ipsa case" where there were no allegations of specific negligence against the physicians involved, and this was not a case involving diagnosis.

The above instruction apparently derived from *Sinkey v. Surgical Associates*, 186 N.W.2d 658 (Iowa 1971), which case in turn spawned Iowa uniform instruction 13.9. *Sinkey* was a case of misdiagnosis. The defendant doctor's evidence disclosed plaintiff's symptoms and x-ray findings were consistent with both tonsillitis and appendicitis. In absence of any contrary expert testimony for plaintiff, we held the defendant doctor was not negligent in mistakenly diagnosing plaintiff's illness as tonsillitis, and affirmed a judgment entered on a directed verdict for defendants.

Trial court obviously patterned instruction 14B after uniform instruction 13.9, except the clause "diagnosis and treatment" was narrowed to the word "treatment." Plaintiff asserts this mutation of the *Sinkey* rule produced a potentially misleading instruction, there was insufficient evidence of specific acts of negligent treatment to justify submitting it, and it was at war with the res ipsa loquitur instruction. Defendants argue the instruction was a proper statement of law, it was a permissible effort to explain the doctors' duty of care and what would constitute a variance from that duty, and this instruction was compatible with the res ipsa loquitur instruction because it informed the jury that if any mistake in treatment occurred, it must be a "negligent" mistake. Alternatively, defendants contend submission of instruction 14B was harmless error because plaintiff's claim should have been dismissed as a matter of law. We discuss this issue in division III.

Uniform instruction 13.9 has never been scrutinized by this court, nor are we required now to determine whether the modified version utilized in this case would be applicable in other circumstances. It was reversible error to submit instruction 14B in this case because it effectively denied plaintiff the benefit of the res ipsa inference of negligence by requiring her to establish a specific error in treatment that did not conform to "the customary practice and procedures of doctors under similar circumstances and in similar localities."

Res ipsa loquitur is a rule of evidence which, when applied, permits but does not compel an inference that defendant was negligent. Under the doctrine the happening of an injury permits an inference of negligence where plaintiff produces substantial evidence that (1) the injury is caused by an agency or instrumentality under the exclusive control and management of defendant and (2) the occurrence is such as in the ordinary course of things would not happen if reasonable care had been used.

*Fosselman v. Waterloo Community School District*, 229 N.W.2d 280, 283 (Iowa 1975) (citation omitted). *See also Dorcas v. Aikman*, 259 Iowa 63, 70, 143 N.W.2d 396, 401 (1966) ("Under the res ipsa doctrine ... the happening of the injury permits but does not compel an inference that defendant was negligent."). The submission of res ipsa is a matter for the court, *Highland Golf Club v. Sinclair Refining Co.*, 59 F.Supp. 911, 915 (N.D.Iowa 1945), and when res ipsa is submitted in a medical malpractice case, the plaintiff is relieved of the burden of showing that specific acts of defendant were below accepted medical standards. The plaintiff still must prove negligence, but he or she does so by convincing the jury the injury would not have occurred absent some unspecified but impliedly negligent act. *See Wiles v. Myerly*, 210 N.W.2d 619, 624, 627 (Iowa 1973). *See also Frost v. Des Moines Still College of Osteopathy and Surgery*, 248 Iowa 294, 302, 79 N.W.2d 306, 311 (1956) ("The injury was of a kind which ordinarily does not occur in the absence of someone's negligence."). *Accord Hale v. Venuto*, 137 Cal. App.3d 910, 918, 187 Cal.Rptr. 357, 361–62 (1982) (The doctrine "permits the jury to infer negligence from the happening of the accident alone .... The inference of negligence which the doctrine permits to be drawn is one which stems from the happening of the accident itself as distinguished from an inference of negligence drawn from evidence of specific acts of wrongdoing ...."); *Fraser v. Sprague*, 270 Cal. App.2d 736, 746, 76 Cal.Rptr. 37, 43 (1969) ("Evidence ... need not establish the fact

that the actual procedure followed by defendant was negligent; it is sufficient if it supports an inference of negligence from the fact that the injury occurred. The inference of negligence ... is one which stems from the happening of the accident itself ...."); *Wasem v. Laskowski*, 274 N.W.2d 219, 224 (N.D.1979) (Doctrine "creates a permissible inference from harmful results that the defendant did not exercise the correct standard of care.").

■ Thus, the jury was asked in the res ipsa instruction to accept or reject an inference of negligence predicated on plaintiff's unexpected injury. Instruction 14B impermissibly conflicted with the res ipsa instruction by telling the jury, in essence, that negligence could not be presumed from an error in defendant doctors' treatment.

■ The defendant medical center casts its lot with the defendant doctors and adopts their arguments with respect to instruction 14B. It does not ask for separate treatment in this case. Nonetheless, instruction 14B by its terms is limited to the doctors' duty and not that of the medical center. Trial court's instructions required the jury to consider the alleged specific acts of negligence against the medical center, and finding no such specific negligence, then to consider the medical center's negligence, if any, under the res ipsa loquitur instruction. We find no ground, in view of our holding in the next division with respect to instruction 14D, to justify a reversal of the judgment in favor of the medical center.

"The giving of instructions which are conflicting and confusing is reversible error," *Hartwig v. Olson*, 261 Iowa 1265, 1278, 158 N.W.2d 81, 88 (1968). *See also Morse v. Incorporated Town of Castana*, 213 Iowa 1225, 1230, 241 N.W. 304, 306–07 (1932) ("[E]rror is committed in the giving of inconsistent instructions. ... the giving of such confusing and conflicting instructions is reversible error." (citations omitted)). Because instruction 14B may have deprived plaintiff of the benefit of the res

ipsa instruction with respect to the doctors, a new trial is required as to them. *See Childers v. McGee*, 306 N.W.2d 778, 780 (Iowa 1981) ("When a court gives inconsistent instructions and a jury returns only a general verdict, it is impossible to tell which instruction the jury followed."). As the case must be remanded, we discuss those additional issues that may arise upon retrial.

## II. *Instruction 14D—Physical Frailties.*

Defendants, citing *Mogensen v. Hicks*, 253 Iowa 139, 110 N.W.2d 563 (1961), ultimately persuaded trial court to give the following instruction:

> Defendants have alleged that they have no control over the physical frailties, allergies, reactions, anomalies, or idiosyncrasies of Plaintiff Erma A. Sammons. They further contend that the alleged condition of her right leg and foot after her treatment by them does not demonstrate a lack of due care.
>
> The plaintiff's physical frailties, allergies, reactions, anomalies, or idiosyncrasies which were unknown to these defendants, if any you find, is a circumstance for you to consider in determining whether or not Dr. Koert R. Smith or Dr. Wilfrido Calderon exercised due care in their treatment of plaintiff in the operating room at Burlington Medical Center on the date in question.

Plaintiff, objecting, pointed out that the *Mogensen* court was "citing [plaintiff's] frailties ... [for] the reason why ... the doctrine of res ipsa has been rejected .... Here we are past that threshold .... They are indicating in this case that the doctor is not in full control of the instrumentalities involved .... I don't think there is anything in the record to support it."

The above instruction first appeared in the record as one of Dr. Smith's requested instructions, applicability of which was argued on two different trial days. When on the second day trial court indicated he had read the cases this defendant relied on and would give the instruction, he had been apprised fully of plaintiff's above objection and others, advanced the prior day on the record, when objections to instructions were made. In these circumstances we think plaintiff preserved the alleged error, despite her more cursory, general and additional objection later lodged, and we reject defendant's contrary contention.

During the trial it became evident defendant doctors were relying on a defense that plaintiff had some physical anomaly that made her unusually susceptible to pressure nerve injury. Admissions were obtained from plaintiff's experts that persons could have such an anomaly, although expert witnesses on both sides agreed there was no objective or definitive indication plaintiff had such a condition. Plaintiff's lead expert opined the chances of plaintiff having some "unusual localized vascular anomaly" at "considerably less than one percent." Other evidence indicated the maximum tourniquet time and pressure were designed to accommodate such cases.

Nonetheless, defendant Dr. Smith expressed the opinion, without objection, that such an anomaly was "exactly the situation in this case." Apparently the opinion was grounded on lack of evidence that some specific act of negligence or malfunction of equipment caused the injury. Despite the rarity of such occurrences and the realization of plaintiff's serious injury from the outset, the doctors testified they never critiqued the operation at the time when the procedures would have been fresh in their minds, and had little recall of the events at trial.

Plaintiff made no specific objection at trial that the instruction was overbroad in including "frailties," "allergies" or other physical conditions that no witness identified as having any relationship to her injury. She argued in district court, and reasserts here, the instruction had no support in the record. Plaintiff points out the diagnosis of allergic reaction discussed in *Mogensen* was supported by the evidence, and it was the basis for the court's rejection of the res ipsa doctrine in that case because

such evidence disclosed defendants did not have exclusive control of the instrumentalities. Consequently, plaintiff argues, *Mogensen* does not support an instruction in this case because trial court did submit the case to the jury on a res ipsa loquitur theory.

■ Although the issue is close, we conclude on this record that trial court did not commit error in giving the above instruction. Under the res ipsa instruction, the court properly left to the jury's determination the two key foundation facts for invoking the permissible inference of negligence under the doctrine: (1) plaintiff's injury by an instrument under the exclusive control of defendants, and (2) an occurrence such as in the ordinary course of things would not happen if reasonable care had been used. *See Reilly v. Straub*, 282 N.W.2d 688, 695 (Iowa 1979); *Cronin v. Hagan*, 221 N.W.2d 748, 751, 753 (Iowa 1974); *Wiles v. Myerly*, 210 N.W.2d at 624–25; Iowa Uniform Jury Instruction 5.12.

■ Contrary to plaintiff's contentions, the court does not find these elements as a matter of law in the process of deciding whether to instruct on the res ipsa theory, but only concludes there is sufficient competent evidence of the existence of the foundational facts to generate a jury question. *See Cronin*, 221 N.W.2d at 748; *Wiles*, 210 N.W.2d at 627. From this it follows that defendants may introduce competent evidence tending to disprove either or both foundational elements. Although there is "no duty to instruct upon an issue without substantial support in the evidence or with support resting only on speculation or conjecture," *Nolte v. Case*, 221 N.W.2d 741, 745 (Iowa 1974), we, unlike the court of appeals, believe there was enough evidence in this record to permit trial court to give an instruction incorporating defendants' theories relating to both foundational facts. In so holding, we do not intimate what evidence or opinions should be admitted under a different record, nor whether the above instruction should be given despite objections not made in this instance.

### III. *The Directed Verdict Issue.*

Defendant doctors argue that even if trial court erred in giving either or both of the above instructions there should be no reversal because the court should have granted their motion for directed verdict. Defendants' application for further review asserts their trial contentions were based on plaintiff's failure to "prove" the existence of the two foundation facts identified in division II.

■ We have noted in division II that these elements need not be established as a matter of law; it is sufficient that plaintiff has produced substantial evidence to generate a jury question. *See Cronin*, 221 N.W.2d at 748; *Wiles*, 210 N.W.2d at 627. Nor is it necessary to exclude all other causes of injury:

> The doctor's testimony as to his theory of pressure necrosis merely suggests other possibilities as to the cause of plaintiff's injury.
>
> The fact other possibilities as to the cause of injury are suggested by the evidence is not sufficient to take away from plaintiff the benefit of the doctrine of res ipsa loquitur.

*Wiles*, 210 N.W.2d at 627. Ordinarily, where plaintiff's evidence justifies submission of the res ipsa theory with its concomitant inference "it takes an indisputably strong and complete defense to direct a contrary verdict as a matter of law." *Id.* at 628.

■ Defendant doctors further assert their directed verdict motions should have been granted because they did not share control of the tourniquet, the instrumentality that plaintiff alleges caused her injury. They concede plaintiff need not prove their "exclusive control" and that "shared control" would suffice. *See Wiles*, 210 N.W.2d at 629; *Frost*, 248 Iowa at 302–03, 79 N.W.2d at 312. These defendants argue the only possible explanation for any excessive pressure on plaintiff's leg was miscalibration of the tourniquet. Such miscalibration would, of course, be traceable direct-

ly to the negligence of defendant medical center. Defendant doctors overlook the fact other possible causes for the excessive pressure also had been suggested.

Dr. Neiman, plaintiff's neurologist, said only that "something happened that was inordinate during the time of the surgery." He refused to assign blame for plaintiff's injury to any one of the three defendants. Dr. Konkel, another expert witness for plaintiff, believed with the defendant doctors that miscalibration was the most likely cause of the injury. However, he also suggested as less likely causes Dr. Smith's failure to ensure correct placement of the tourniquet and Dr. Calderon's failure to monitor it. At trial defendant Dr. Calderon found these suggestions persuasive enough to indicate Dr. Smith should be kept in the case despite the latter's directed verdict motion. His counsel argued, "All the testimony ... places the responsibility for the cuff selection [and padding] on either the doctor or the hospital ...."

■■■ Although it is true that plaintiff alleged and introduced evidence the medical center did not properly check the operation or calibration of the tourniquet machine prior to her operation, some proof of such alleged specific acts of negligence should not deprive her of the right to proceed on the theory of res ipsa loquitur. The Washington Supreme Court has addressed this issue defendants raise and has resolved it in plaintiff's favor. "A case against one defendant which ... would ... go to the jury under the res ipsa loquitur doctrine is not prevented from doing so by the existence of evidence of negligence on the part of another defendant." *Douglas v. Bussabarger*, 73 Wash.2d 476, 487, 438 P.2d 829, 836 (1968). Although we have never made so strong a statement, it is not, in the circumstances of this case, an unwarranted extension of our statement in *Reilly v. Straub*, 282 N.W.2d at 695, that:

[I]t is quite generally agreed that the introduction of some evidence which tends to show specific acts of negligence on the part of the defendant, but which does not purport to furnish a full and

complete explanation of the occurrence does not destroy the inferences which are consistent with the evidence, and so does not deprive the plaintiff of the benefit of res ipsa loquitur.

Quoting W. Prosser, *The Law of Torts* § 40 at 232 (4th ed. 1971). Although this plaintiff introduced evidence suggesting negligence on the part of defendant medical center, it was not shown that this alleged negligence was the certain cause of her injury. It follows that this partial proof should not strip her of the right to invoke the res ipsa loquitur doctrine against the other defendants who could have contributed to the unfortunate result.

We need not again detail the other evidence that justified submission of the res ipsa issue to this jury. Trial court rightly overruled defendant doctors' motions for directed verdict.

## IV. *Other Issues.*

■■■ The jury received the case at noon and returned their verdict for all defendants at about 2:30 p.m. Plaintiff concedes our rule that "shortness of time taken by a jury in arriving at its verdict has no effect upon the validity of the verdict either in civil or criminal cases," *Lappe v. Blocker*, 220 N.W.2d 570, 574 (Iowa 1974); *see State v. Chadwick*, 328 N.W.2d 913, 918 (Iowa 1983). In her motion for new trial, however, plaintiff alleged this brevity of deliberations indicated the bias of the jurors, a number of whom had been patients in defendant medical center and treated by defendant Dr. Smith. Trial court correctly found several facts distinguished plaintiff's situation from that disclosed in *Thompson v. Rozeboom*, 272 N.W.2d 444 (Iowa 1978), including plaintiff's failure to make a motion for change of venue. *See Rudolph v. Iowa Methodist Medical Center*, 293 N.W.2d 550, 555 (Iowa 1980) ("[E]rrors to which objection could be made at trial may not be raised for the first time as grounds for new trial.").

■■■ Plaintiff's final new trial argument is that the verdict was contrary to the weight of the evidence. The court agreed

with plaintiff that she seemed to have proven her case, stating that "if the Court were to be completely honest, it would have to state that had it been the trier of fact, it would have concluded the greater proof was with the plaintiff," but it also recognized that it could not "substitute its judgment for that of the jury." "[T]he judge should not grant a new trial merely because reasonable [persons] might disagree with the jury's conclusion," *Kaiser v. Stathas*, 263 N.W.2d 522, 525 (Iowa 1978). This general rule applies with special force in negligence cases because "questions of negligence, ... and proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law." Iowa R.App.P. 14(f)(10). Trial court did not abuse its broad discretion in denying plaintiff's new trial motion.

For the reasons assigned in division I, we affirm in part and vacate in part the decision of the court of appeals and remand the case to district court for new trial against the defendant doctors. Costs of defendant medical center are taxed to plaintiff; all other costs are taxed to the defendant doctors.

DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; REMANDED FOR NEW TRIAL.