Robert HOFFMAN and Chalmer S. Russell, Appellees,

v.

NATIONAL MEDICAL ENTERPRISES, INC.; Medical Oxygen Service, Inc.; Larry Stockman; and Pro–Lung Associates, Inc., Appellants.

No. 88–77.

Supreme Court of Iowa.

June 14, 1989.

Rehearing Denied July 13, 1989.

Mark McCormick, Kevin M. Abel of Belin, Harris, Helmick, Tesdell, Lamson & McCormick, P.C., Des Moines, for appellants.

Patrick M. Roby, Kevin H. Collins, and Diane Kutzko of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellees.

Considered by HARRIS, P.J., and LARSON, NEUMAN, SNELL, and ANDREASEN, JJ.

SNELL, Justice.

This appeal arises from jury verdicts in favor of the plaintiffs, Robert Hoffman and Chalmer Russell, on all of their claims against the defendants—Pro–Lung Associates, National Medical Enterprises (NME), Medical Oxygen Service (MOS), and Larry Stockman. We reverse and remand.

In 1980, plaintiffs, who were respiratory therapists, founded Pro–Lung, which provided oxygen equipment and services to patients in their homes and in nursing homes. Over the next two years they expanded the business somewhat, but this expansion was constrained by limited resources. In 1982, in order to facilitate greater expansion, plaintiffs sought to sell Pro–Lung to a larger business, while retaining their management duties.

In late 1982, plaintiffs contacted NME and began negotiations with an officer of MOS, a subsidiary of National Medical Oxygen Company (NMOC), which in turn was owned by NME. The parties ultimately agreed on a total purchase price of $550,-000, approximately 75% of which ($412,000) was to be paid at closing. MOS was the purchaser of Pro–Lung under the stock purchase agreement executed at closing on March 31, 1983. Plaintiffs also executed employment agreements with Pro–Lung and executed, with MOS, covenants not to compete with Pro–Lung. The parties dispute whether the remaining $138,000 of the purchase price was to be paid as deferred compensation or as consideration for the covenants not to compete.

In May 1983, an attorney for NME performed a routine Medicare compliance audit at Pro–Lung. Based on her findings, NME requested several changes in Pro–Lung's Medicare reporting procedures. Plaintiffs promptly made these changes.

Problems in the relationship of the parties persisted, however. On June 23, 1983, plaintiffs' superior wrote a letter to his supervisor at MOS to suggest either that plaintiffs' responsibilities be shifted or that their employment with Pro–Lung be terminated. Plaintiffs were not informed of these concerns.

In September 1983, plaintiffs went to an NME seminar in California, where they met with Stockman, who was the president of NMOC and a director of Pro–Lung. Stockman told them they could buy back Pro–Lung or resign. When they declined to do either, he immediately suspended them, brought in a replacement at Pro–Lung, and had the locks changed at Pro–Lung. Plaintiffs met with Stockman again on October 14. When they again declined to resign, Stockman and an NME attorney threatened to have them prosecuted for Medicare fraud, based on the reporting discrepancies found in May. Plaintiffs nonetheless remained adamant in their refusal to resign, so their employment with Pro–Lung was terminated the next day.

This litigation commenced shortly thereafter, with the following claims ultimately submitted to the jury: (1) breach of employment contract against Pro–Lung; (2) fraudulent misrepresentation against NME and MOS; (3) interference with contractual relations against NME and MOS; and (4) extortion against NME, MOS, and Stockman. Additionally, punitive damage claims were submitted against NME and MOS on all of the tort claims, and against Stockman on the extortion claim.

The jury awarded plaintiffs identical verdicts on all four claims, as well as punitive damages. The jury awarded each of them $293,700 on the breach of contract count; $15,000 on the interference with contract and fraud counts, which were combined; $15,000 on the extortion count; and punitive damages in the amount of $243,000 against NME, $100,000 against MOS, and $24,300 against Stockman.

■ I. *Fraud Claim.* The first issues raised on appeal by NME and MOS are that (1) there was insufficient evidence to support submission of the fraud claim, and (2)

the trial court improperly submitted the fraud instruction on reliance. We are persuaded only the latter assignment of error is meritorious.

The jury was instructed that:

Bob Hoffman and Steve Russell were justified in relying on the defendants NME and/or MOS representation of opinion if one or more of the following situations exist:

1. The defendant NME or MOS has or claims to have special knowledge of the matter that the plaintiff does not have; *or*

2. The defendant has a relation of trust and confidence with the plaintiff; *or*

3. The defendant has successfully tried to gain the plaintiff's confidence; *or*

4. The defendant knows of some special reason to expect that the plaintiff will rely on the opinion.

NME and MOS contend this instruction was erroneous due to a lack of evidence to support a finding of a confidential relationship, the second and third situations listed.

We have stated that a confidential relationship

exists when one person has gained the confidence of another and purports to act or advise with the other's interest in mind.... The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done. Purpose of the doctrine is to defeat and correct betrayals of trust and abuses of confidence.

*Oehler v. Hoffman*, 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962).

In *Kurth v. Van Horn*, 380 N.W.2d 693, 695–96 (Iowa 1986), we noted that "fiduciary relationship" has been similarly defined as:

[a] very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another. One founded on trust or confidence reposed by one person in the integrity and

fidelity of another. A "fiduciary relation" arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other.

. . . .

Some of the indicia of a fiduciary relationship include the acting of one person for another; the having and the exercising of influence over one person by another; the reposing of confidence by one person in another; the dominance of one person by another; the inequality of the parties; and the dependence of one person upon another.

Some relationships that necessarily give rise to a fiduciary relationship include those between an attorney and client, guardian and ward, principal and agent, executor and heir, and trustee and *cestui que trust. Id.* at 696.

In this case, the parties were businessmen negotiating the sale of Pro–Lung. Plaintiffs were represented by counsel at all times pertinent to this endeavor. There is nothing in the record to suggest inequality of the parties or dominance of plaintiffs by NME and MOS during the negotiations. A finding of confidential relationship is not supported by the evidence.

It is a well-settled rule that the record must contain substantial evidence to support a proposed instruction. *E.g., Sammons v. Smith,* 353 N.W.2d 380, 387 (Iowa 1984). It is error to instruct on an issue having no substantial evidentiary support. *Hoekstra v. Farm Bureau Mut. Ins. Co.,* 382 N.W.2d 100, 107 (Iowa 1986); *Clinton Land Co. v. M/S Associates, Inc.,* 340 N.W.2d 232, 234 (Iowa 1983).

The trial court erred by instructing the jury that it could find the reliance component of plaintiffs' fraud claim was satisfied by a finding of a confidential relationship. The fraud verdict must be reversed and remanded for a new trial.

**II.** *Inconsistency of Verdicts.* Defendants claim an inconsistency exists between the verdict for breach of contract against Pro–Lung and the verdicts for fraud and interference with contract against NME and MOS. Because we have already decided the fraud verdict must be reversed, our discussion will be confined to the breach of contract and interference with contract verdicts.

With regard to damages for breach of contract, the jury was instructed in pertinent part:

The proper measure of damages for breach of contract is an amount that shall place Robert Hoffman and Steve Russell in the position they would have been had the employment contract been fully performed by Pro–Lung. The damages you award must be foreseeable or have been reasonably foreseen at the time the parties entered into the contract.

The damage instruction for interference with contract stated:

The proper measure of damages for interference with existing contractual relations is in an amount which will put the plaintiffs Bob Hoffman and Steve Russell in the same financial position they would have been had the employment contract been fully performed by Pro-Lung. Plaintiffs are also entitled to consequential damages. Consequential damages are damages in addition to contract damages which you find to have been proximately caused by interference by Defendants.

The jury subsequently found plaintiffs each sustained damages in the amount of $293,700 due to the breach of contract and $15,000 due to the interference with contract (when combined with the fraud verdict).

It is fundamental that a jury's verdicts are to be liberally construed to give effect to the intention of the jury and to harmonize the verdicts if it is possible to do so. *Granger v. Fruehauf Corp.,* 412 N.W.2d 199, 203 (Mich.1987); *see Verhel v. Independence School Dist. No. 709,* 359 N.W. 2d 579, 592 (Minn.1984). The test is wheth-

er the verdicts can be reconciled in any reasonable manner consistent with the evidence and its fair inferences, and in light of the instructions of the court. *See Verhel,* 359 N.W.2d at 592. Only where the verdicts are so logically and legally inconsistent that they cannot be reconciled will they be set aside. *Granger,* 412 N.W.2d at 203.

The jury was instructed that damages for interference with contract included (1) the damages generally recoverable for breach of contract, and (2) additional consequential damages proximately caused by the interference. Thus, the damages for interference with contract must be at least equal to the damages for breach of contract in order for the verdicts to be consistent. Here, the damages for interference were far less than those for the breach.

Plaintiffs contend this was the result of the jury only awarding consequential damages against NME and MOS for interference with contract. They assert the jury declined to award damages recoverable for breach of contract against NME and MOS because it had already awarded those damages against Pro–Lung.

This argument is premised purely on speculation. The jury was never instructed to avoid awarding overlapping or duplicative damages for breach of contract and interference with contract. Nor is there any indication, other than perhaps the jury's findings themselves, that the jury attempted to avoid such duplication.

The verdicts are clearly inconsistent and there is no way to determine which verdict is inconsistent with the jury's intent. We conclude the verdict for breach of contract against Pro–Lung and the verdicts for interference with contract against NME and MOS must be reversed and remanded for a new trial.

■ III. *Extortion Claim.* Plaintiffs' claim for damages arising from the tort of extortion is based on their assertion they suffered emotional distress. The challenge raised by NME, MOS, and Stockman to the extortion verdicts relates to the sufficiency of the evidence to prove this element of plaintiff's claim for damages. Specifically, defendants contend insufficient evidence was introduced that plaintiffs sustained any damages as a result of defendants' threats to have them prosecuted for Medicare fraud if they did not resign from Pro–Lung.

Hoffman testified he was "totally taken aback" by the threats of prosecution. Russell testified he was "flabbergasted" and that he did not tell his wife of the threats because he "simply didn't want her to have to carry that burden or the threat of losing a husband and the father of her kids."

As in *Dickerson v. Young,* 332 N.W.2d 93, 98 (Iowa 1983), the issue of emotional distress in this case is not the gravamen of the claim brought; it is merely an item of damage. We therefore view the evidence in the light most favorable to the verdicts and not under the more stringent standards applicable to a claim for severe emotional distress. *See Harsha v. State Sav. Bank,* 346 N.W.2d 791, 800–01 (Iowa 1984).

In *Dickerson,* 332 N.W.2d at 97, the plaintiffs' mobile home and its contents were bulldozed over and then burned while they were away. Mrs. Dickerson testified she cried and her husband was upset when they discovered the burned rubble that was once their home. We concluded this testimony, when supported by the physical facts of the destruction of their home, was sufficient evidence of the Dickersons' emotional distress. *Id.* at 99.

Similarly, in *Blessum v. Howard City Bd. of Supervisors,* 295 N.W.2d 836, 845 (Iowa 1980), where the plaintiff was wrongfully denied a hearing before he was discharged from his employment, we concluded there was substantial evidence to support emotional distress damages. Blessum testified the hearing denial caused him to have difficulty sleeping and that he considered moving because his problem was known to all his friends and social acquaintances. He also testified the denial adversely affected his work and that his attempt to get a hearing was the biggest thing in his family life. *Id.*

In *Curnutt v. Wolf,* 244 Iowa 683, 685, 57 N.W.2d 915, 917 (1953), the plaintiff was threatened with the loss of his job unless

he dropped a suit for back wages against his employer. Curnutt testified the threat left him completely upset and caused him to worry day and night. We upheld Curnutt's claim for mental pain and anguish, subject to a remittitur. *Id.* at 690, 57 N.W. 2d at 919.

The damages shown by plaintiffs' testimony in this case do not even rise to the relatively low level of those found sufficient in *Dickerson, Blessum,* and *Curnutt.* There is no evidence either plaintiff was emotionally upset by defendants' threats. Neither of them apparently had difficulty eating, sleeping, or working after being threatened. They clearly found defendants' actions annoying and frustrating, but the record does not indicate they found them worrisome. In short, merely being "totally taken aback" or "flabbergasted" simply does not constitute emotional distress, as a matter of law. Plaintiffs' claim failed in this regard and the trial court erred by submitting the extortion claim to the jury.

IV. *Punitive Damages.* Because the extortion verdict against Stockman must be reversed, so must the punitive damage award against him be reversed. Similarly, the punitive damage awards against NME and MOS must be reversed, as we have concluded NME and MOS are entitled to new trials on the fraud and interference with contract claims.

V. *Issues on Remand.*

A. *Consequential Damages.* Plaintiffs seek to recover damages allegedly arising from their purchase and sale of real property in reliance on the employment agreements with defendants. This issue, legally and factually, may be developed on retrial to determine what damages, if any, were proximately caused by defendants' acts.

B. *Interest.* Because we are reversing the judgments against defendants we do not address the validity of the trial court's award of interest. This issue may or may not recur on remand.

C. *Covenants not to Compete.* The trial court interpreted the covenants not to compete as including all areas in which NME and MOS were in business, as well as

the business area served by Pro–Lung. The court therefore determined the covenants were unenforceably broad as a matter of law, thereby preventing MOS from raising their breach as a defense or counterclaim. We disagree with the trial court's interpretation.

Although the covenants were between *MOS* and plaintiffs, by their terms they only prohibited competition between *Pro–Lung* and plaintiffs. The covenants could, however, be enforced by MOS and corporations controlling or controlled by MOS. On retrial, the trial court should determine the reasonableness of restricting plaintiffs' competition with Pro–Lung, and not with NME and MOS.

VI. *Disposition.* To summarize, we reverse the extortion verdicts and the punitive damages awards against NME, MOS and Stockman. We reverse and remand for new trial on the breach of contract claim against Pro–Lung, and the fraud and interference with contract claims against NME and MOS.

REVERSED AND REMANDED.