# IN THE COURT OF APPEALS OF IOWA

No. 16-0684
Filed April 19, 2017

**BASTION CAPITAL GROUP, INC.,**
	Plaintiff-Appellee,

**vs.**

**GARY MATTHEWS,**
	Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Karen A. Romano, Judge.

The defendant in an action for breach of contract appeals from the jury's verdict, which found the defendant breached the contract and awarded damages to the plaintiff. **AFFIRMED AND REMANDED.**

Joseph A. Cacciatore of Graham, Ervanian & Cacciatore, L.L.P., Des Moines, for appellant.

David W. Nelmark of Gislason & Hunter L.L.P., Des Moines, for appellee.

Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

The defendant, Gary Matthews, appeals from a jury verdict, which found he had breached the contract he entered into with the plaintiff, Bastion Capital Group, and awarded Bastion damages in the amount of $113,540.49. The jury verdict awarded damages on three of five instances of forbearance by the lender, followed by consequential transactions to the benefit of Matthews. Matthews maintains the district court abused its discretion in admitting testimony of Matthews's net worth and evidence of the disposition of two properties that occurred after the forbearance agreement was signed. He claims the court also abused its discretion in sustaining an objection to a question directed to Matthews's foreclosure attorney about the meaning of a term used in the contract between Matthews and Bastion. Additionally, Matthews maintains the jury's verdict was illogical and inconsistent, thus warranting a new trial. In response, Bastion asks us to affirm the jury's verdict and remand for the determination and award of "reasonable" appellate attorney fees.

**I. Background Facts and Proceedings.**

Matthews is a commercial real estate developer in Peoria, Illinois. As of June 2014, he was involved with a number of commercial properties, and he was in default on some loans related to those properties. Matthews had cross-collateralized his loans, and the bank began foreclosure actions on a number of commercial properties[1] that had been designated as collateral. Additionally, Matthews had personally guaranteed a number of the loans.

---

[1] Matthews had also pledged part of a multi-million dollar developer's fee that he was set to receive for another commercial property.

Matthews reached out to Leo Skeffington, the sole shareholder and employee of Bastion, for help.[2] Then, on June 20, 2014, Matthews entered into a written agreement with Bastion, titled "Syndicate Finance Agreement" (SFA). The agreement provided that Matthews would pay Bastion a "commitment fee" of $15,000 when the agreement was entered into; this fee paid for ninety days of Bastion's services. Matthews would then pay $2500 for each additional month. The agreement was "to remain in effect for a term of three hundred sixty[-five] (365) days commencing" on the date it was signed. The agreement could be "terminated early by either party with a written notice no later than thirty (30) days prior to the end of the then current month," and early termination did "not preclude [Bastion] from receiving 'Success Fees' owed during the original term" of the agreement. Additionally, a signed amendment to the contract provided:

> 1. Bastion . . . is to be paid a successful resolution fee approximately 1.5% upon successful agreed upon resolution between Morton Community Bank . . . and Gary Matthews regarding addendum A any and all debts Bastion . . . is restructuring with Gary Matthews, Bastion Capital will be paid a bonus fee. For example $1,000,000 loan is restricted to agreeable terms between all parties: $1,000,000 x 1.5% = $15,000.00 bonus fee.
> 2. In the event that Bastion . . . is successful in refinancing existing loans with Morton Community Bank . . ., Bastion Capital will be paid a 1.5% fee. For example new loan of $1,000,000 x 1.5% = $15,000 bonus fee.
> A[] Bonus success fee is only paid to Bastion . . . upon all parties signing relevant closing documents signifying agreement with all terms, covenants, obligations of such contractual agreement. If relevant and/or responsible managing parties do not sign closing contractual agreement which would trigger a transaction funding there is no fee to be paid.

---

[2] We ascribe actions taken by Skeffington to Bastion throughout, and we use the two interchangeably.

Matthews also agreed to pay "[a]ny traveling expenses which [Bastion] incurs in carrying out its obligations" and "all fees, and costs, including reasonable attorneys' fees incurred as a result of" any legal action Bastion was required to take "to collect the fees or expenses" outlined in the contract, including fees resulting from an appeal.

At the time Matthews and Bastion entered into the agreement, there was already a July 3 hearing scheduled for the appointment of a receiver for the properties.

On July 1, Bastion sent the bank a proposal from another lending institution that was considering refinancing the debt for Matthews. The next day, personnel from the bank sent Bastion an email stating the bank had received the refinance proposal and had "asked our counsel to delay the [receivership] hearing for one week so that we could continue to have negotiations with you and [Matthews] relative to a proposed solution."

Matthews and his foreclosure attorney, Christopher Ryan, met with personnel from the bank and the bank's attorneys on July 7. Skeffington was unable to attend the meeting in person, and he joined by way of a conference call. At some point during or soon after the meeting, it became clear the bank was not interested in giving Matthews the time to pursue refinancing the loans through another lending institution. Skeffington testified the bank was looking for a "quick resolution" and did not want to wait the amount of time it would take to obtain appraisals of the properties—approximately forty-five to sixty days. According to Ryan, the two sides were not having meaningful negotiations toward a resolution until Ryan threatened that Matthew might choose to pursue

bankruptcy if they were unable to reach some sort of agreement to prevent the foreclosure.

Following the meeting, on July 7, Skeffington sent Matthews an email, stating, in part:

> We have the same goal in sight as you. We want you to maintain all your equity in the properties as well as you maintaining ownership. This is what the engagement reads as well as our proposal sent last week. Please read the Global resolution which . . . states the valuation wi[ll] be at [the refinancing institution's] sole discretion. We could get to par and/or close to par. However, as always this process is a negotiation with the bank. We represent you as an investment bank, and some of those negotiations could include an internal restructuring which our engagement states.

Following the July 7 meeting, the focus was on an attempt to reach a forbearance agreement between Matthews and the bank. On July 9, the bank's attorneys sent Ryan a first draft of a forbearance agreement. Skeffington, Ryan, and Matthews discussed various terms and Ryan continued to negotiate with the bank's attorneys for the next few weeks; a number of revised drafts were completed.

On August 5, Matthews entered into a forbearance agreement with the bank.[3] There were five loans at issue:

The first loan was for EM Riverside L.L.C., which housed a PetSmart and had outstanding debt of approximately $3,487,000. The forbearance agreement gave Matthews until December 31, 2014, to sell the property. If Matthews was

---

[3] The first page of the forbearance agreement includes information about ten loans Matthews had with the bank, totaling approximately $12.7 million in outstanding debt. By the time of trial, Bastion had clarified that it was only claiming damages for having restructured five of those loans. We discuss the details of the forbearance agreement only insofar as it pertains to those five loans.

able to sell the property before December 31, the bank would take what it was owed, Matthews would receive 10% of whatever was left to pay down another loan he had with the bank, and the rest would go to Matthews's investors. If Matthews was not able to find a buyer, the bank would take the property by deed in lieu of foreclosure. If it did so, the bank agreed to discharge the entire loan, thus also removing Matthews's personal guaranty. The property was ultimately sold on November 18, 2014, for $4,658,703.

The next property, Riverside Retail, is a strip mall, which included a Radio Shack. It had outstanding debt of approximately $2,150,000. The second property was given similar terms to the first in the forbearance agreement; Matthews had until December 31, 2014, to attempt to sell the property. If he was successful, the bank would receive what it was due, and then he would receive the first 15% of what was left to pay down another loan he had with the bank. His investors would then receive the rest. Matthews was unable to sell Riverside Retail, and the bank took the property by deed in lieu of foreclosure. The entire debt on the property was discharged when the bank did so.

The third property is EM Barclay, L.L.C., and it was also a strip mall, housing a Sherwin Williams. The property was subject to debt of $2,615,000. On August 5, 2014—the date the forbearance agreement was signed—Matthews executed a deed in lieu of foreclosure, returning the property to the bank. The bank released the full debt and paid $100,000 toward other deficient loans.

Similarly, Matthews executed a deed returning EM Drake, L.L.C. (a Qdoba) to the bank on August 5. In return, the bank discharged the entire $1,420,000 and put $50,000 toward Matthews's other deficiencies.

The fifth property at issue was listed in a chart on the front page of the forbearance agreement, but it was otherwise not dealt with in the agreement itself. The bank held the second mortgage—worth $900,000—on the GEM Terrace. The Terrace housed Matthews's office, and another bank had the first, senior mortgage on the property for $2,500,000. The property was eventually sold for $3,500,000 and both the mortgages were then discharged.

Matthews had not told Skeffington about the meeting with the bank to sign the forbearance agreement, and Skeffington did not attend. Skeffington learned of the meeting on August 5 and sent Matthews a text message, stating, "Was unaware of meeting this morning. Please call me afterwards. Glad we are able to get this internal restructuring done. As part of engagement we should be present at meeting for your benefit. Regardless we can talk after meeting." Matthews did not call Skeffington after the meeting.

Two days later, Skeffington emailed Ryan and asked for a copy of the "finalized closed restructuring/forbearance agreement." Ryan did not send a copy. Later the same day, Matthews emailed Ryan asking him to "give us a call to discuss the attached [Bastion] contract."

Also on August 7, Skeffington emailed Matthews asking him to "[p]lease call . . . to talk regarding restructuring." Matthews responded that he would call the next morning.

The next day, Skeffington and Matthews spoke on the phone. Following the conversation, Skeffington sent Matthews an email, stating, in part:

> As of today you called to inform after successful resolution that we were not due a success fee which is contradictory to fully

executed engagement. We would like to understand you[r] position in detail.

Regardless if it is your intention not to pay Bastion Capital Group, Inc. a success fee based on a successful resolution with [the bank], I ask you to advise with my counsel . . . .

We strongly suggest you review the engagement with counsel and further will have no other option than to pursue our rights via the fully executed engagement.

On August 11, Matthews sent Bastion a letter giving notice that he was cancelling their agreement effective September 11, 2014—a date still within the original ninety days covered by the commitment fee. Additionally, it stated:

Please note that of services listed in paragraph one, you were only involved with some negotiations with the Lenders. No refinancing has occurred and no buyers have been obtained by you for any properties in question. After consulting with my attorney, I've been advised that you are not owed any fees per Amendment A as no loans have been refinanced or restructured. We do not believe that being required to turn over properties, sell the remaining properties within 4 months and providing [the bank] with additional collateral is a 'successful' resolution of the . . . debt.

As you recall, you told me that you had Lenders that would take out [the bank], which again never materialized. . . . Any further contact should be done through my attorney.

Bastion filed the present suit on November 3, claiming breach of contract.[4] Matthews filed a counterclaim asserting Bastion had breached the same contract.

The matter was scheduled for trial in January 2016. In the days leading up to the start of trial, each side filed a number of motions in limine. Matthews maintained the court should exclude evidence of his net worth because the information was irrelevant and prejudicial. The court ruled:

At this point, I think there may be some relevance to it, but I'm going to take that portion of the motion in limine under

---

[4] Bastion originally claimed additional theories of recovery, which it voluntarily dismissed before trial commenced.

advisement. So before we get to testimony which would elicit either the numbers that are in that document or the time in which you want to offer that document, the parties need to notify the court and we'll probably have some further discussion about that.

Matthews also asked the court to instruct plaintiff's counsel and witnesses "not to refer to, testify concerning or any way call the jury's attention to property sales, transactions, the filing of deeds in lieu of foreclosure or other activities that took place after the forbearance agreement" was signed. Matthews maintained that because Skeffington conceded that the forbearance agreement was the "relevant closing document" that would, if anything did, trigger the payment of the bonus fee, and because Bastion had made its demand for payment of the bonus fee on August 8, the jury should not be allowed to consider what happened to any of the properties afterward. Bastion argued the information should be included because the two parties were disputing whether the forbearance agreement was a "successful resolution." The court took the matter under advisement but indicated it was leaning toward admitting the evidence.

In its motion in limine, Bastion asked the court to rule that Ryan—Matthews's foreclosure attorney—could not testify about the contract between Matthews and Bastion. Bastion argued that since Ryan had not seen the contract until after the forbearance agreement was signed and a dispute arose between Matthews and Bastion, Ryan had no fact knowledge about the contract that he could share. Additionally, Ryan had not been designated as an expert. Matthews clarified that he wanted Ryan to talk about "what was the forbearance agreement, was it restructuring of the loans, refinancing of the loans, did it result in a transaction funding at the closing?" The court ruled:

It is clear that the definition of the terms of the contract, apparently from what you're telling me, are going to be part of the crux of the issues here for this jury to decide and I'm not going to allow Mr. Ryan to testify what the terms within the contract . . . that's the subject of this litigation, I'm not going to allow him to testify as to what the meaning of those terms are.

At trial, Skeffington testified that by the time Matthews hired him, the bank was no longer interested in negotiating with Matthews and was ready to just complete foreclosure proceedings. Skeffington credited himself with getting the bank "back to the table" to discuss other options. He testified Matthews was concerned about being sued by his investors if the foreclosures went through because of the cross-collateralization of the various properties and loans. Skeffington had sent to Matthews a number of text messages and emails referring to the forbearance agreement as a "restructuring of the debt"; Matthews had never responded disputing the characterization of the agreement as "restructuring." Additionally, Matthews had allowed and encouraged Skeffington to be part of meetings and discussions about the forbearance agreement until the meeting to sign the document. Matthews did not advise Skeffington of the closing meeting or send a copy of the final agreement after it was signed.

During his testimony, the question of whether Skeffington could mention Matthews's net worth arose again. The court ruled that the financial statement including the net worth would not be admitted as an exhibit, but Skeffington could be asked questions about the information on the document and could use the document to refresh his recollection. The court clarified:

I think he can talk about the total if it's information based upon the questions that were relevant to Mr. Skeffington's decisions on what course of actions he could or could not have taken pursuant to the contract that we're talking about. He can talk about

that. If that had some impact on the course of action he took, he can talk about that in summary fashion.

Skeffington testified that he had requested information from Matthews about his personal financial situation because of the personal guaranties he made on some of the loans. He testified without objection that the amount of Matthews's net worth was relevant to the viability of a bankruptcy option for Matthews. When Bastion's attorney asked if Skeffington recalled what Matthews's personal net worth was, Matthews objected that it was not relevant, and the court overruled. Skeffington then testified Matthews's net worth was $21 million. When asked, Skeffington testified that a "transaction funding," as used in the contract between him and Matthews, "is where money is coming in from one area and going somewhere else or being applied somewhere else."

Matthews testified that he had a number of conversations with the bank that were ultimately unsuccessful before he hired Skeffington; at the time he contracted with Bastion, the bank had finished negotiating with him. Matthews agreed Bastion had sent a refinancing proposal to the bank, which the bank declined because it did not want to discount its mortgages when there was equity in the properties and it did not want to wait the amount of time it would take. Matthews testified he hired Bastion to bring in new capital or investors; his goal was to keep all of his properties.

The matter was submitted to the jury, which returned a verdict in favor of Bastion. The jury found that Matthews had breached the contract and awarded Bastion damages in the amount of $113,540.49. The damages are the sum of the travel expenses claimed by Bastion and the "bonus fee" for three of the five

properties, EM Riverside, L.L.C.; EM Barclay, L.L.C; and EM Drake, L.L.C.[5] The jury denied Matthews's counterclaim, and Matthews does not include that verdict in his appeal.

Matthews filed a motion for new trial. He re-asserted his evidentiary arguments, claiming the court abused its discretion in admitting evidence of his net worth and the post-forbearance disposition of properties. He maintained the court abused its discretion in excluding Ryan's testimony about the meaning of "restructuring" in the contract between Matthews and Bastion. And he argued that jury's verdict was "inconsistent, illogical, and represented a compromised verdict." The court denied Matthews's motion.

Matthews appeals.

## II. Standards of Review.

We review the district court's evidentiary rulings for an abuse of discretion. *Giza v. BNSF Ry. Co.*, 843 N.W.2d 713, 718 (Iowa 2014).

As to the claim of inconsistent verdicts, "[g]enerally, the trial court has some discretion when faced with inconsistent answers in a verdict." *Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 609 (Iowa 2006). "However, the question whether a verdict is inconsistent so as to give rise to the exercise of that discretion is a question of law." *Id.* "Therefore, we review the district court's conclusion as to whether answers are consistent for correction of errors at law." *Id.*

---

[5] Although the jury was not required to provide a breakdown of the damages it awarded, both parties agree that total was reached by multiplying 1.5% by the outstanding debt on the three properties, $3,487,000; $2,615,000; and $1,420,000 respectively, and then adding the travel expenses of $710.49.

**III. Discussion.**

    **A. Net Worth.**

Matthews maintains the district court abused its discretion in admitting Skeffington's recollection of the amount of Matthews's net worth at trial. He argues the evidence is irrelevant and that its probative value is outweighed by its prejudicial impact. In response, Bastion claims that Matthews has failed to preserve his claim regarding the potential prejudice of the evidence.

    *1. Relevance.* "Evidence is relevant when it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *McClure v. Walgreen Co.*, 613 N.W.2d 225, 235 (Iowa 2000) (quoting Iowa R. Evid. 401 [now 8.401]). "The test is 'whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if [the person] knew of the proffered evidence.'" *Id.* (alterations in original) (citations omitted).

    Here, the disputed evidence came in during examination of Skeffington, in the following exchange:

> Q. Is an individual's personal financial assets also a criterion considered in bankruptcy proceedings and whether they are allowed? A. Absolutely.
> Q. In this situation, did you learn the total net worth of Mr. Matthews'[s] personal situation? A. Yes.
> Q. What do you recall that to be?[6]
> . . . .
> A. I believe it was around $21 million.
> Q. So roughly $9 million more than the $12 million owed to [the bank]? A. That's to the best of my recollection, yes.
> Q: In theory, would all of that additional wealth would have been at risk if the personal guarantees remained in place?
> . . . .

---

[6] Matthews interjected with a relevance objection, which the court overruled.

A. Yes.

When offering the evidence, Bastion claimed it was relevant because it helped establish both that bankruptcy was not an option for Matthews and that reaching a forbearance agreement was a "successful resolution." On appeal, Matthews maintains neither is applicable. Although Ryan had testified he threatened the lender with bankruptcy by Mathews, Matthew now contends bankruptcy was never an option. Skeffington's testimony implied that Matthews would not want to declare bankruptcy since his net worth was approximately $9 million more than his outstanding debt to the bank, but it became clear during Matthews's testimony that he had a large amount of other debt—more than $9 million—not listed on the forbearance agreement.[7] Even if the net worth figure was relevant to the problems with a bankruptcy solution to Matthews's problems, that testimony could have been offered in more general terms, without including a specific number.

An issue at trial was whether the forbearance agreement was successful compared to bankruptcy filing, making the evidence of net worth marginally relevant to the issues.

Even if the evidence was not relevant to the issues, "[n]ot every ruling admitting irrelevant evidence requires reversal." *McClure*, 613 N.W.2d at 235. We only reverse if the erroneous ruling affected a substantial right of the party. *See* Iowa R. Evid. 5.103. A "presumption of prejudice arises when the district

---

[7] Matthews testified he had more loans at the bank than just the $12.7 million listed on the forbearance agreement, which he estimated "in excess of 10 million." Additionally, only the second mortgage was held by the bank on one of the properties in question—GEM Terrace, L.L.C.—and there was testimony that there was a first mortgage worth approximately $2.5 million held by another bank.

court has received irrelevant evidence over a proper objection," but "the presumption is not sufficient to require reversal if the record shows a lack of prejudice." *McClure*, 613 N.W.2d at 235.

Matthews maintains he was prejudiced by the introduction of his net worth because the information "had an undue tendency to improperly influence the jury's determination regarding liability." Our case law generally prohibits the introduction of evidence of a party's net worth out of concern the jury will be motivated to act based on that information. *See Hall v. Montgomery Ward & Co.*, 252 N.W.2d 421, 424 (Iowa 1977) ("The rule in this jurisdiction has been that with certain exceptions not involved here, a defendant's pecuniary condition may not be shown although the plaintiff asks smart money. This view . . . state[s] that if pecuniary condition is shown the fact finder will tend to get off on the relative poverty or affluence of the parties, despite trial-court instructions to juries, the issues of liability and damages will become intermixed." (citation omitted)); *cf.* Iowa R. Evid. 5.411 ("Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully."). Here, we believe the record establishes that Matthews was not prejudiced by the one mention of the specific amount of his net worth. On the specific facts of this case only, the evidence of net worth was marginally relevant and not prejudicial. While Matthews has focused on the one piece of testimony, there was plenty of other evidence presented that indicated Matthews was wealthy. For example, there was testimony that GEM Terrace, L.L.C. was a large commercial building that housed Matthews's offices and was so-named for him (with his initials). Additionally, the jury was aware that Matthews had been

able to take loans of more than $20 million from the bank, and presumably the bank would not make such large loans without reason to believe they could be paid back. There was also testimony about the developer's fee—worth more than $8 million—that Matthews stood to earn once the hotel he was developing in 2014 was completed. We do not believe putting a specific number on Matthews's wealth was more likely to improperly influence the jury than other evidence properly before the jury. *See Klinge v. Luana Sav. Bank*, No. 13-0275, 2013 WL 5951214, at *7 (Iowa Ct. App. Nov. 6, 2013) ("In any event, even if the evidence was not relevant, its admission did not unfairly prejudice [the plaintiff]. The evidence was not inconsistent with other evidence of [plaintiff's] financial condition admitted without objection at trial." (citation omitted)).

Matthews maintains we should reverse for new trial because "evidence of net worth has historically been held to be relevant only where punitive damages are claimed." He relies on *Hoekstra v. Farm Bureau Mutual Insurance Company*, 382 N.W.2d 100, 109–10 (Iowa 1986) for this proposition. In *Hoekstra*, the appellant argued it was prejudiced by the admission of evidence of its net worth when the plaintiffs had pled both compensatory and punitive damages. 382 N.W.2d at 109. The court noted that "[e]vidence of net worth is admissible on the issue of punitive damages . . . but not on the issue of compensatory damages." *Id.* (citation omitted). However, even though the jury had been given evidence of the defendant's net worth, the defendant had not been prejudiced. *Id.* at 110. The court reasoned, "Although liability was found on the count I breach of contract claim, the jury did not misuse the net worth evidence in making such a

determination." *Id.* The jury had been told in a jury instruction how to compute the damages, and it was presumed the jury obeyed the instructions. *Id.*

Similarly, here, the jury was instructed that if it found Matthews had breached the contract, "you may consider the following [in your consideration of damages]: 1. The amount of expenses incurred by Bastion but not reimbursed by Matthews. 2. The amount of any success bonus fee pursuant to the contract." As both parties agree, the jury awarded damages in the amount of the travel expenses, and the bonus fee on three of the five loans. Thus, there is nothing to suggest the jury in this case did anything other than follow the jury instructions to determine the appropriate damages.

Moreover, our supreme court has already been asked to consider implementing a per se rule that a new trial is warranted whenever evidence of net worth was admitted when not relevant, and the court declined to do so. *See Lala v. Peoples Bank & Trust Co.*, 420 N.W.2d 804, 807 (Iowa 1988) ("We decline to adopt a per se rule that would require a new trial in all cases where net worth is allowed upon a punitive damage claim that is then set aside by action of either the trial court or upon appeal.").

### *2. Probative Value.*

Matthews also asserts that evidence of his net worth should have been excluded because its probative value is substantially outweighed by the danger of unfair prejudice. *See* Iowa R. Evid. 5.403.

This issue has not been preserved for our review. Although Matthews cited to Iowa Rule of Evidence 5.403 in his motion in limine, he never received a

ruling on the issue from the district court, and he did not re-assert the objection during trial.

> Ordinarily, error claimed in a court's ruling on a motion in limine is waived unless a timely objection is made when the evidence is offered at trial. . . . [W]here a motion in limine is resolved in such a way it is beyond question whether or not the challenged evidence will be admitted during trial, there is no reason to voice objection at such time during trial.

*State v. Tangie*, 616 N.W.2d 564, 568–69 (Iowa 2000) (citation omitted).

Here, Matthews did not get a ruling on the motion in limine. Rather, the court stated:

> At this point, I think there may be some relevance to it, but I'm going to take that portion of the motion in limine under advisement. So before we get to testimony which would elicit either the numbers that are in that document or the time in which you want to offer that document, the parties need to notify the court and we'll probably have some further discussion about that. That will give me some time as well to read through your respective briefs in support of and in resistance to that part of the motion and I'll take it under advisement. I think it may be relevant depending on how the testimony comes in so we'll revisit that.

Later, during a break in Skeffington's testimony, outside the presence of the jury, Bastion informed the court that he was close to the point in his examination of Skeffington when he intended to introduce evidence of Matthews's net worth. During the exchange between the attorneys and the court, Matthews never re-raised the issue of unfair prejudice mentioned in his pre-trial motion in limine. The court ruled the evidence was admissible, stating, "I think he can talk about the total if it's information based upon questions that were relevant to Mr. Skeffington's decisions on what course of actions he could or could not have taken pursuant to the contract that we're talking about."

Moreover, Matthews's claim that he did not need to object is belied by the fact that he did object during Skeffington's testimony—just not as to the probative value. When Skeffington's attorney asked him if he recalled what Matthews's total net worth was, Matthews's attorney interjected, stating, "I object as to not being relevant to this matter." The question of whether the probative value was substantially outweighed by the prejudice is not preserved for our review.[8]

## B. Post-Forbearance Disposition of Properties.

Matthews maintains the district court abused its discretion in admitting evidence of the disposition of the properties that occurred after the forbearance agreement was signed on August 5, 2014. Specifically, he objected to admission of evidence of the sale of EM Riverside, L.L.C. on November 18, 2014, and the bank's filing the deed in lieu of foreclosure on the Riverside Retail property on July 7, 2015. He maintains what happened with the properties after the forbearance agreement was signed is not relevant to whether a bonus fee was due.

The relevant contract language is:

A[] Bonus success fee is only paid to Bastion . . . upon all parties signing relevant closing documents signifying agreement with all terms, covenants, obligations of such contractual agreement. If relevant and/or responsible managing parties do not sign closing contractual agreement which would trigger a transaction funding there is no fee to be paid.

We note that both parties agree the forbearance agreement is the "relevant closing document," and Skeffington testified at trial that "the determination

---

[8] Even if we were to conclude the motion in limine sufficiently preserved error and the district court's ruling impliedly considered the application of Iowa Rule of Evidence 5.403, we would not find its probative value outweighed by unfair prejudice for the reasons we stated relative to other evidence of Matthews's net worth in the record.

whether a bonus would be paid is to be made at the time of closing." But nothing in the contract states the closing of the contractual agreement and the transaction funding must occur contemporaneously. Rather, the contract requires the closing documents—here, the forbearance agreement—to "trigger" a transaction funding. "Trigger" simply means "an event that precipitates others" or "to initiate, set off." *Trigger*, *The American Heritage Dictionary* (2nd college ed. 1985); *see also Harrington v. Univ. of N. Iowa*, 726 N.W.2d 363, 368 (Iowa 2007) ("In searching for the meaning of contractual terms, we often resort to the dictionary to ascertain a term's common meaning."). We believe the later disposition of the properties is relevant, insofar as those later actions were precipitated by the forbearance agreement.

The eventual sale of EM Riverside, L.L.C. was made possible by the forbearance agreement; the agreement gave Matthews until December 31, 2014, to sell the property on the open market in an attempt to extract the best price. The forbearance agreement provided Matthews with a similar opportunity for Riverside Retail, but he was unable to sell it. The bank then proceeded in accordance with other provisions of the forbearance agreement, which stated, "If Lender accepts and records the Riverside Retail Deed in Lieu and takes possession of the Riverside Retail Property, then in exchange, Lender will release in full the Riverside Retail Loan, and no Borrower to, or guarantor of, the Riverside Retail Loan will have any further liability." In other words, in exchange for the deed to the property, the bank discharged the entire loan and released Matthews's personal guaranty, as contemplated by the forbearance agreement.

Because the later disposition of the properties was relevant to deciding whether a transaction funding had been "triggered" by the forbearance agreement, the district court did not abuse its discretion in allowing the evidence to be admitted.

### C. Testimony from Foreclosure Attorney.

Matthews maintains the district court abused its discretion in excluding testimony from Ryan, Matthews's foreclosure attorney, regarding whether the forbearance agreement was a "restructuring" of the loans in foreclosure.

Ryan helped negotiate and draft the forbearance agreement Matthews and the bank ultimately entered. He did not, however, help draft or advise Matthews regarding the SFA contract Matthews entered into with Bastion. At trial, Ryan was asked by Matthews's attorney if, based on his knowledge of the loans in foreclosure and the terms of the forbearance agreement, any of the loans had been restructured. Bastion objected, and the district court sustained the objection. Matthews maintains Ryan was not being asked to interpret or define terms in the SFA but rather was being asked whether any loans had been restructured, "as he understood the term." Matthews asserts this testimony falls within Iowa Rule of Evidence 5.701, which allows a lay witness to testify in the form of an opinion if that opinion is "[r]ationally based on the witness's perception; [h]elpful to clearly understanding the witness's testimony or to determining a fact in issue; and [n]ot based on scientific, technical, or other specialized knowledge within the scope of rule 5.702."

Ryan was not in a position to opine about the meaning of "restructuring" as used in the contract between Matthews and Bastion, as he was not a party

and had not helped negotiate it. *See Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001) ("The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract."); s*ee also Whitley v. C.R. Pharmacy Serv., Inc.*, 816 N.W.2d 378, 390 (Iowa 2012) ("To properly admit a lay witness's testimony, a sufficient factual foundation must be established showing the witness's opinion is based on firsthand knowledge and 'personal knowledge of the facts to which the observed facts are being compared.'" (citation omitted)).

Ryan was not designated as an expert witness, and his testimony about his individual belief of the general banking term "restructuring" would have been inapposite to the issues before the jury. *Cf.* Iowa R. Evid. 5.702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact at issue."). Matthews maintains Ryan should have been allowed to testify about the term "restructuring" in the SFA by arguing his testimony would have been analogous to that which our supreme court found should have been admitted in *Hansen v. Central Iowa Hospital Corp.*, 686 N.W.2d 476, 484 (Iowa 2004). In *Hansen*, the district court sustained the defendant's motion to strike the testimony of the plaintiff's doctor because the plaintiff had failed to designate the doctor as an expert witness. 686 N.W.2d at 479. First, unlike here, the parties made an offer of proof of the doctor's would-be testimony, so the supreme court was able to review it. *Id.* at 484. And second, the supreme court ruled the testimony should have been admitted

because "it [was] also clear from the offer of proof that [the doctor] formed his causation opinion as a *treater. . . .* There [was] no record evidence that the [doctor's] causation opinion was formulated as a retained expert for purposes of issues in pending or anticipated litigation." *Id.* This is unlike the facts here, where Ryan had not been involved with or even seen the SFA until Matthews reached out to him to question whether he had to pay the bonus fee—clearly already anticipating that he may dispute the meaning of the terms in the contract.

Matthews maintains Ryan had firsthand knowledge regarding the loans that were the subject of the forbearance agreement and the terms of the forbearance agreement itself. That is not disputed, and Ryan was allowed to— and did—testify as to both. But that does not explain how Ryan's opinion whether the loans had been "restructured"—either as a banking term of art or as meant in the SFA could be based on first-hand knowledge. Here, we cannot say the district court abused its discretion in sustaining the objection to the question calling for Ryan's opinion about "restructuring."

### D. Inconsistent Verdict.

Matthews maintains the jury's verdict was illogical, inconsistent, and represented a compromised verdict, and the district court erred in denying his request for a new trial. In response, Bastion maintains that, while it disputes Matthews's contention, Matthews's complaint is actually with the award of damages. Thus, Bastion argues that if we find in favor of Matthews on this issue, we should remand on only the issue of damages.

"It is fundamental that a jury's verdicts are to be liberally construed to give effect to the intention of the jury and to harmonize the verdicts if it is possible to

do so." *Hoffman v. Nat'l Med. Enter., Inc.*, 442 N.W.2d 123, 126 (Iowa 1989). "The test is whether the verdicts can be reconciled in any reasonable manner consistent with the evidence and its fair inferences, and in light of the instructions of the court." *Id.* at 126–27.

The following chart includes the relevant facts of the properties and whether the jury awarded damages on each:

| Property | Outstanding Debt | Final Disposition | Damages Awarded? |
|---|---|---|---|
| EM Riverside, LLC | $3,487,000 | Had until 12/3/20141 to sell on open market. Sold 11/18/2014 ($4.658 mil) | Yes |
| Riverside Retail | $2,150,000 | Had until 12/31/2014 to sell, but was unsuccessful; executed deed in lieu of foreclosure. (removed personal guaranty—no additional money involved) | No |
| EM Barclay, LLC | $2,615,000 | Executed deed in lieu of foreclosure on 8/5/2014 (discharged loan plus additional consideration toward other deficiencies--$50,000) | Yes |
| EM Drake, LLC | $1,420,000 | Executed deed in lieu of foreclosure on 8/5/2014 (discharged loan plus additional consideration toward other deficiencies--$100,000) | Yes |
| GEM Terrace | $900,000 (2nd mort.) | Was not included in forbearance agreement; some testimony that it eventually sold for $3.5 million (and first mortgage was worth $2.5 million) | No |

Matthews maintains the jury must have reached a compromised verdict because the forbearance agreement treated EM Riverside, L.L.C. the same as Riverside Retail; for both, Matthews was given until December 31, 2014, to sell the property on the open market, and if he was not successful, the bank would execute a deed in lieu of foreclosure and discharge the entire loan and his

personal guaranty. However, the jury awarded damages on one of the properties—EM Riverside, L.L.C.—and not the other—Riverside Retail.

Matthews's argument is largely premised on the notion that the jury should not have been allowed to consider the later disposition of the properties, but we have already concluded that evidence was properly before the jury. Once we consider the later dispositions, and Matthews's own charge to the jury to go loan by loan to consider whether each individually had been restructured and then "triggered a transaction funding," the jury's verdict is easily reconciled.

The jury first had to decide whether each loan had been restructured by the forbearance agreement. We can infer the jury found that each of the loans actually contained in the forbearance agreement had been restructured. The forbearance agreement laid out in certain terms how four of the properties would be disposed of, namely: EM Riverside, L.L.C., Riverside Retail, EM Barclay, L.L.C., and EM Drake L.L.C. GEM Terrace was not included in the forbearance agreement, although it was mentioned as part of Matthews's outstanding debt on the first page. It became clear through the testimony of Matthews and Ryan that the bank was limited in the actions they could take regarding GEM Terrace because another bank held the more senior mortgage. Thus, no action was taken on that loan.

Of the four loans that had been restructured, only three resulted in a transaction funding: EM Riverside, L.L.C., EM Barclay, L.L.C., and EM Drake, L.L.C. EM Riverside was eventually sold for approximately $1.3 million more than the outstanding debt on the property. EM Barclay, L.L.C. and EM Drake L.L.C. were each returned to the bank by way of deed in lieu of foreclosure on

the date the forbearance agreement was signed, but the bank did more the discharge the debt, it also gave Matthews's additional consideration—$50,000 for one and $100,000 for the other—to be put toward other deficient loans the bank held. In contrast, the jury did not award damages for Riverside Retail, which Matthews was never able to sell. Instead, Riverside Retail was eventually returned to the bank by deed in lieu of foreclosure, and in exchange, the bank discharged the loan and Matthews's personal guaranty. Matthews did not receive any additional funds—to be put toward outstanding loans or otherwise.

While the forbearance agreement treated EM Riverside, L.L.C. and Riverside Retail the same, the factual differences between the ultimate disposition of the two properties informed the jury's verdict; we have no reason to believe they jury's verdict was illogical or a compromise. The district court did not err in denying Matthews's motion for new trial.

**F. Appellate Attorney Fees.**

Bastion asks that we remand to the district court for determination of an award of the additional attorney fees incurred by Bastion in this appeal. The contract signed by the parties provides:

> Attorney Fees. If [Bastion] takes any action or initiates a proceeding to enforce, protect, or establish any right to remedy under this Agreement, including but not limited to an action to collect the fees or expenses outlines in Section 2 above, [Bastion[ shall be entitled to recover from Client all fees and costs, including reasonable attorney's fees incurred as a result of such action or proceeding *and in any appeal of such action or proceeding*.

(Emphasis added.)

Thus, we remand to the district court for the limited purpose of determining the award of reasonable fees incurred by Bastion on appeal. *See NevadaCare,*

*Inc. v. Dep't of Human Serv.*, 783 N.W.2d 459, 470 (Iowa 2010) ("When a contract contains a clear and express provision regarding attorney fees, the court's award must be for reasonable fees."); *see also* Iowa Code § 625.22 (2015) ("When judgment is recovered upon a written contract containing an agreement to pay an attorney fee, the court shall allow and tax as a part of the costs a reasonable attorney fee to be determined by the court.").

**IV. Conclusion.**

Because we find testimony of Matthews's net worth was not prejudicial, evidence of the disposition of two of the properties post-forbearance was properly before the jury, the district court did not abuse its discretion in sustaining an objection to Ryan's testimony about the meaning of a term in the contract, and the jury's verdict was neither illogical or inconsistent, we affirm. We remand to the district court for determination of an award of reasonable appellate attorney fees for Bastion.

**AFFIRMED AND REMANDED.**